**ARMOUR OF AMERICA, Plaintiff,**

v.

**UNITED STATES, Defendant,**

v.

**ArmorWorks, LLC, Intervenor–Defendant.**

No. 04–1731C.

United States Court of Federal Claims.

Filed: Dec. 30, 2010.

Unsealed and Issued for Publication:
Jan. 10, 2011.[1]

---

**1.** This opinion was issued under seal on December 30, 2010. The parties were given the opportunity to propose redactions to the opinion. The defendant indicated no redactions were needed. The plaintiff and the intervenor did not respond to the court's December 30, 2010 Order regarding redactions. The opinion, therefore, is unsealed without redactions.

728

Cynthia S. Malyszek, Malyszek & Malyszek, Westlake Village, California, for the plaintiff.

Leslie C. Ohta, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With them were Matthew H. Solomson, Bryant G. Snee, Deputy Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, and Tony West, Assistant Attorney General, Civil Division. Of counsel, Bridget Jarvis, Office of Chief Counsel, Naval Air Systems Command, Patuxent, Maryland.

Steven D. Gordon, Holland & Knight LLP, Washington, D.C., for the intervenor. With him was David J. Craig, Holland & Knight LLP, Washington, D.C.

## OPINION

HORN, Judge.

The government terminated plaintiff Armour of America's contract with the United States Navy for default, based on the alleged

failure by Armour of America to make progress in accordance with the terms of the contract, thereby endangering performance of the contract. The Navy completed the contract with a reprocurement contractor, ArmorWorks, also the intervenor in this case.[2] Armour of America filed a complaint in this court and, then, an amended complaint, which alleges a breach of contract based on bad faith and abuse of discretion (Count I), and a breach of the government's duty to cooperate and not hinder performance (Count II). Plaintiff seeks to convert what it believes was an improper termination of the contract for default into a termination for the convenience of the government (Count III). Plaintiff seeks $3,029,833.00 in breach of contract damages. Defendant, in a counterclaim, seeks $1,507,438.00, plus administrative costs of $45,630.00, for a total amount of $1,553,068.00 from the plaintiff in reprocurement costs. Following extended discovery, in part due to the illness and ultimate passing of a principal witness for the plaintiff, a trial was held in the case, after which the parties filed post-trial briefs.

## FINDINGS OF FACT

The Navy issued a Request For Proposals (RFP) for a Light Weight Armor Replacement System (LWARS). The procurement was to replace the existing metallic armor system on the CH–46E helicopter used for military transportation, with lighter weight armor. The Navy's contracting officer, Janice Woehrer, explained during trial that:

The role of the CH–46[E] helicopter is to provide logistical support. It carries equipment, logistics items between ships and it also acts currently, most importantly act [sic] as a Medivac helicopter in war zones like Iraq and Afghanistan, inserting

itself on the battlefield picking up wounded soldiers and taking them back to be fixed up.

The metallic armor plates on the helicopter protect its engines and flight controls from small arms fire. The Navy's RFP No. N00019–04–R–0073 stated that:

The Statement of Work (SOW) for this effort is defined in Sections 3 through 8 below. It defines the efforts to be performed by the contractor. In accordance with the SOW, the contractor shall design, test and manufacture a Light Weight Armor Replacement System (LWARS) for the Marine Corps' CH–46E tandem rotor helicopter. The contractor shall meet or exceed all requirements defined by this parent document as well as subordinate documents to the extent they apply, unless otherwise directed by the government.

In addition, Section 4.1 of the Statement of Work stated the weight and ballistics requirements:

4.1. *LWARS Requirements (CLIN 0001):* The contractor shall design a [sic] LWARS to be a fit and function lightweight replacement for the existing metallic armor system. The existing armor design, installation, marking/identification, and finish requirements are defined by drawing numbers listed in paragraph 4.1.1 below. The LWARS shall provide, at a minimum, a 35% reduction in areal density[3] over the existing metallic armor system, and no recurring routine maintenance after installation. The LWARS shall be capable of at least a $V_{50}$[4] ballistic limit of 2900 feet per second against a .30 caliber APM2[5] threat at 30–degree angle of obliquity.[6] The LWARS shall be able to withstand multiple ballistic impacts, and be made of mate-

2. ArmorWorks, the reprocurement contractor, intervened in this case for the sole purpose of protecting its proprietary rights, and otherwise did not participate in the pre-trial, trial or post-trial activities in the case.

3. Areal density is measured in pounds per square foot, and is the measure of the weight of armor per the unit area of armor applied.

4. In evaluating armor design, $V_{50}$ represents the impact velocity at which 50% of the threats to

the armor are defeated by the armor, and 50% of the threats perforate the armor.

5. APM stands for Armor Piercing Missile.

6. Obliquity is a measure, normally expressed in degrees, of the extent to which the impact of a projectile fired to armor deviates from a normal line to the target. For example, a projectile fired perpendicular to armor has 0 degrees obliquity.

rial that readily accepts the surface finish requirements of the aircraft.

The parties have stipulated that the solicitation called for designing, testing and fabricating a Light Weight Armor Replacement System for the CH–46E helicopter, with a 35% reduction in weight from the existing armor, capable of withstanding a threat with a $V_{50}$ ballistics limit of 2900 feet per second, against a .30 caliber armor piercing missile at a 30 degree angle of obliquity. The RFP did not specify what armor material must be used; instead, the requirements the armor had to meet were specified.

> Armour of America proposed its own KSP–60[7] armor in response to the RFP: Armour of America's proposed armour system to be supplied as a lightweight substitute for the current metallic armour is our Grades [sic] KSP–60.

> Grade KSP–60 armour has an areal density of 6.1 lbs per square foot. This areal density, based on an approximate areal density of the current metallic armour of 11.0 lbs per square foot will offer a weight savings of 43%.[8]

Armour of America's proposed 43% weight savings was greater than the 35% weight reduction required by the Statement of Work.

Nine proposals were received by the Navy in response to the solicitation. A competitive range was established with five offerors, including plaintiff Armour of America and intervenor/reprocurement contractor Armor-Works. The Navy's evaluation factors were Technical, Past Performance, and Price. The Technical and Past Performance factors combined were significantly more important than Price. The Technical subfactors were Weight Reduction, Ballistics, Environmental Compatibility, Fit (conformance to the armor mounting layout), and Technical Capability. Of these Technical subfactors, Weight Reduction was more important than the other four Technical subfactors combined, with each of the other four subfactors of equal importance.

During the initial technical evaluation, Armour of America received an overall Technical rating of Highly Satisfactory, with Medium Risk. For the Ballistics subfactor, however, Armour of America received a rating of Unsatisfactory, with High Risk. Armour of America's initial evaluation on all of the Technical subfactors, including Ballistics, was as follows:

| Technical Subfactor | Rating | Risk |
|---|---|---|
| Weight Reduction | Outstanding | Medium |
| Ballistics | Unsatisfactory | High |
| Environmental Compatibility | Satisfactory | Medium |
| Fit | Satisfactory | Low |
| Technical Capability | Marginal | Medium |

In response to the ballistics requirements, Armour of America submitted ballistics test data, but for different threats and velocities than called for by the RFP. During discussions, the contracting officer asked Armour of America and the other offerors in the competitive range nineteen questions, several of which were related to the ballistics requirements of the RFP. The contracting officer's Question 3 was: "Provide an assessment of whether your proposed LWARS will meet the Government's ballistics requirements to include documentation, analysis or examples for how your proposed LWARS material will meet the V50[sic] specification."

In its response to the contracting officer's discussion questions on ballistics, Armour of America stated: "During ballistic testing validation and verification, AOA will demonstrate the multiple hit capabilities." In the same response to the contracting officer, Armour of America also stated: "Per the RFP the armour will be tested to V50[sic] ballistic limits." Armour of America's also responded to Question 3 as follows:

> 3. **Ballistic Capability**—As discussed in the original proposal, Armour of America's KSP–60 will stop the following rounds at velocities shown.

---

7. KSP–60 is an aluminum oxide.

8. Subsequently, the weight savings proposed by Armour of America was measured at 41%.

| 7.62 × 39 | Russian/Chinese | Hardcore | @ | 2400 FPS [9] |
|---|---|---|---|---|
| 7.62 × 54R | Russian/Chinese | Hardcore | @ | 2800 FPS |
| 7.62 × 51 | NATO | Ball | @ | 2700 FPS |
| 5.56 × 109 | NATO | Ball | @ | 3300 FPS |
| 5.56 × 885 | NATO | Hardcore | @ | 3200 FPS |
| 5.56 | NATO | AP | @ | 3150 FPS |

Thus, Armour of America did not address the exact threat contained in the RFP involving a .30 caliber armor piercing round at 2900 feet per second.

The initial Technical Evaluation Report Summary stated that:

AOA [Armour of America] failed to provide a test plan or other documentation to demonstrate their ability to design armor to meet the .30 caliber APM2 threat. AOA submitted ballistic test data summaries for different threats (not .30 caliber APM2), at lesser velocities than the LWARS requirement, and not in the V50 [sic] format.... AOA failed to demonstrate their ability to determine constant velocity, angle of obliquity, or $V_{50}$ ballistic limit.... These findings led the TET [Technical Evaluation Team] to rate this sub-factor as *Unsatisfactory* with *High* risk. (emphasis in original).

Nevertheless, the Technical Evaluation Team assigned Armour of America an overall, initial Technical rating of Highly Satisfactory with Medium Risk. In Armour of America's initial, Overall Technical Summary, the Technical Evaluation Team stated it "believes that AOA has clearly demonstrated that they understand the requirement and are capable of meeting the LWARS requirements specified in the RFP." The Technical Evaluation Team identified Armour of America's strengths, as follows:

AOA's proposed LWARS will have a [sic] anticipated aerial [sic] density of 41% which exceeds the RFP requirement [of 35%] by 6%.

AOA states they have previously supplied armor to five rotory [sic] wing manufacturers.

AOA states their proposed LWARS material has successfully passed multi-hit testing and demonstrated a capability of stopping 3 shots inside a 3–inch diameter circle although the threat was undefined.

A reputable independent third party IAW MIL–STD–810 [10] has conducted some environmental testing of their proposed material.

AOA states in their proposal they can quickly ramp up workforce and raw materials.

The Navy's final Technical Evaluation Supplemental Report noted the lack of supporting documentation, but concluded: "Armour of America states they will meet the ballistics requirements of the RFP." The final Technical Evaluation assessed Armour of America, as follows:

| Technical Subfactor | Rating | Risk |
|---|---|---|
| Weight Reduction | Outstanding | Medium |
| Ballistics | Satisfactory | High |
| Environmental Compatibility | Satisfactory | Medium |
| Fit | Satisfactory | Low |
| Technical Capability | Satisfactory | Medium |

On Armour of America's final Technical Evaluation, the Ballistics rating changed from Unsatisfactory to Satisfactory, and the Technical Capability rating changed from Marginal to Satisfactory. There were no other changes between the initial and final evaluations of plaintiffs proposal in either ratings or risk factors, and the Overall Technical Rating remained Highly Satisfactory, with Medium Risk.

The Source Selection Evaluation Board evaluated the final proposals of the five offerors in the competitive range as follows:

---

**9.** FPS stands for feet per second.

**10.** MIL–STD–810 relates to Military Standard Environmental Test Methods.

| Offeror | Technical Rating | Proposal Risk | Past Performance Risk | Total Evaluated Price—147 Kits |
|---|---|---|---|---|
| ArmorWorks | Outstanding | Low | Low | $6,224,797.00 |
| Armour of America | Highly Satisfactory | Medium | Low | $4,079,860.00 |
| Hardcore Composites | Satisfactory | Low | Low | $4,164,215.00 |
| M–Cubed (RBBC) | Highly Satisfactory | Medium | Low | $4,771,469.00 |
| Neptune Precision | Marginal | Medium | Low | $3,533,636.00 |

Plaintiff, Armour of America, was deemed the best value and recommended for award by the Source Selection Evaluation Board, based on proposing the best weight reduction, and the lowest price among the four offerors with a technical rating of Satisfactory or better.

The Source Selection Evaluation Board's recommendation was adopted by the Source Selection Authority, Carole A. Tisone, who stated:

> Armour of America proposed the highest aerial [sic] density reduction at 41% combined with an assigned technical rating of Highly Satisfactory. Although Armour of America received a proposal risk rating of Medium, the Technical Evaluation Team stated that the risk could be mitigated through close Government's [sic] involvement and oversight of the program. In addition, Armour of America's proposed price was the lowest of the four (4) offerors who received a Satisfactory or better proposal rating. Therefore, with proper consideration given to the evaluation criteria and the evaluation teams' findings, Armour of America's proposal represents the best value to the Government and should receive the award.

Armour of America, therefore, was awarded contract no. N00019–04–C–3147, the Light Weight Armor Replacement System for the CH–46E helicopter on June 10, 2004. The parties have stipulated that the contract awarded to Armour of America had a potential value of $6,038,958.00, including the base contract and options. Contract Line Item Number (CLIN) 0001 was for "LWARS Non–Recurring Engineering," and CLIN 0002 was for "Qualification Test Articles [QTAs]." Both CLINs were to be delivered "NLT [not later than] 5 MOS After Contract Award." CLIN 0001, for non-recurring engineering was for designing, developing and testing the armor. CLIN 0002 ordered two sets of the QTAs. The QTAs were due five months after contract award. CLIN 0003 was for "Data for CLINs 0001–0002," and CLIN 0004 was for "Travel in Support of CLINs 0001–0002." CLINs 0001–0004 comprised the base contract. The value of the base contract was $119,814.00. The parties have stipulated that, at the time of the termination for default, no options had been exercised.

Plaintiff and the Navy agreed to change the weight reduction requirement in the Statement of Work to "41% +/–5 lbs." This was a weight enhancement compared to the minimum 35% reduction in weight contemplated in the RFP. The ballistics requirements in the RFP remained unchanged in the contract: the armor "shall be capable of at least a V50 [sic] ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at 30–degree angle of obliquity." Furthermore, the RFP required that the new armor system be able to withstand "multiple ballistic impacts." Armour of America proposed, and the Navy accepted, the further enhancement that the armor system would be able to withstand multiple ballistic impacts of "3 equidistant hits in a 3–inch circle . . . ."

On July 14, 2004, more than a month after contract award, a Program Management Review (PMR) was conducted with Navy and Armour of America personnel. At the PMR, Armour of America's General Manager, John Nehmens, gave a briefing on the LWARS. One of his slides depicted the following testing on Armour of America's KSP–60 armor panels:

| | | | |
|---|---|---|---|
| 7.62 × 51 | NATO | 2750 FPS @ 0 Meters |
| 7.62 × 39 | Russian/Chinese | 2400 FPS @ 0 Meters |
| 5.56 M 193 | NATO | 3200 FPS @ 0 Meters |
| 5.56 M 855 | NATO Hardcore | 3150 FPS @ 0 Meters |
| 5.56 | NATO AP | 3150 FPS @ 0 Meters |

The .30 caliber armor piercing round from the Statement of Work's ballistics requirements was not included on Armour of America's slide. Armour of America's written notes of the meeting, which are contained in the record, state that: "The NAVAIR [Naval Air Systems Command] requirement is 30 cal [11] APM2 at 30° obliquity. What AoA [Armour of America] is currently proposing will not stop that threat. AoA proposed that armor can be made to stop the 30 cal APM2 at 30° obliquity threat but that the armor would be approximately 1 lb heavier." Armour of America took an Action Item from the PMR to "assess the 30 cal APM2 at 30° obliquity threat and determine the weight addition." At the PMR, the President of Armour of America, Arthur Schreiber,[12] also questioned the velocity of 2900 feet per second in the ballistics requirements, but when Navy personnel would not ease the 2900 feet per second requirement, Mr. Schreiber recalled indicating that he could achieve the requirement, but with materials other than KSP–60. Mr. Schreiber recalled stating: "Yes, I have worked with silicon carbide. Give me 30 days."

Armour of America's General Manager, John Nehmens, in recalling what transpired at the July 14, 2004 PMR, testified at trial that when Armour of America briefed its testing of KSP–60:

the Navy was quite shocked and surprised that we were still going down the path of KSP–60, which offered the weight reduction, but didn't offer the ballistics that they

were looking for. We, from Armour of America, was [sic] surprised that they were surprised of what we were going to give them. At that point in time, you might say that the tone of the meeting was far from hostile, but it was—I think there was some disbelief on both sides, and confusion, and shock on both sides.

. . .

Then at the end of the day, it was left—the question was asked whether Armour of America could manufacture the requirement with the .30 caliber, and Mr. Schreiber said he could. He said that he would do it for the same price that was involved in the original contract, and that he would deliver what they wanted, and we would go back and start developing the armor, and doing the design. . . .

Mr. Nehmens' recollection was that the replacement for KSP–60 was not identified the day of the PMR, but that ultimately Armour of America began to work with silicon carbide.

The Navy's Program Manager, United States Marine Corps Colonel Mitchell Bauman, also testified about the July 14, 2004 PMR:

Q. [by defendant's counsel] Can you describe what happened during Armour of America's presentation at the preliminary design review?

A. [by Colonel Bauman] My engineers asked the question about the ability [of KSP–60] to stop the armor piercing requirement, the .30 caliber APM2, and Mr. Schreiber stated that they couldn't, and they never said they could, and it was about that time I stopped the briefing and just wanted to have a government-only meeting and wanted to understand how we should go forward here, and again we brought the contractor back in the room there. We decided we're going to see what we can do with this, and let's try to make this work. What can we do?

---

11. Cal is short for caliber.

12. Due to the unfortunate death of Mr. Schreiber before his testimony could be taken at trial, the parties and the court agreed to introduce into evidence and rely on Mr. Schreiber's pre-trial deposition.

Q. Was that the first time you were aware that KSP–60 could not meet the ballistic specifications?

A. Yes. I was a little taken aback and disappointed and kind of shocked, and everybody on my team was, so it was very surprising because when we sign contracts supporting the war fighter, that we're going to go do this together.

A few days following the July 14, 2004 PMR, on July 19, 2004, Armour of America advised the Navy that a test on July 19, 2004, "did not go as well as expected," with respect to the armor weight and ballistics requirements. More than two weeks after the PMR, on July 30, 2004, the LWARS Source Selection Authority, Carol Tisone, issued a cure notice to Armour of America:

> You are hereby notified that the Government considers your failure to successfully demonstrate that your Light Weight Armor Replacement System (LWARS) product meets the basic requirements of contract N00019–04–C–3147, to be a condition that is endangering performance of the contract. Therefore, unless this condition is cured to the Government's satisfaction by 25 August 2004, the government may terminate for default under the terms and conditions of the Default (Fixed–Price Supply and Service) (APR 1984) clause 52.249–8.

In order for performance to no longer be in question, the cure letter required the following of Armour of America:

> 1. Demonstrate via an independent laboratory or test facility that the LWARS product meets or is less than the maximum weight of 6.79 lbs/sq ft.[13] Provide test results to substantiate your proposed material is capable of at least a V50 [sic] ballistic limit of 2900 feet per second against a .30 cal APM2 threat at 30–degree angle of obliquity.
>
> 2. Demonstrate that the LWARS product will meet or exceed all other test requirements of the contract, especially Environmental and Vibration requirements. This can be done via actual test data or through preliminary analysis of the proposed material.
>
> 3. Provide specific detail on maintenance requirements for the new LWARS material.
>
> 4. Provide the samples which have already been tested to PMA–226 for further analysis. The samples requested are those that demonstrated success and which meet or exceed the weight requirements of the contract. These samples should be shipped in the most expeditious manner to the following: [place of business omitted].
>
> 5. Provide any information with regard to any enhancements this material may provide over and above the minimum requirements provided in the original RFP....

A few days after the July 30, 2004 issuance of the cure notice, on August 4, 2004, company President Schreiber indicated that Armour of America was using silicon carbide, had tested 13 panels in-house, and was making "very good headway." However, Mr. Schreiber objected to the ballistics specifications, stating that "2900 FPS does not prove anything—it is not a logical threat." He further indicated that:

> We most respectfully submit that even if the velocity were shown to be 2900 FPS it does not and never has been possible to get this .30 CAL AP–M2 round to this velocity. Most certainly it is not made anywhere in the world nor can you add enough of the "same" powder to get it to 2900 FPS without the danger of exploding in the rifle when fired. The velocity of 2900 FPS is just not out there.

Armour of America used H.P. White Laboratory, Inc., an independent testing facility, for ballistics resistance testing of armor panels. The record contains an August 23, 2004 letter from H.P. White Laboratory, showing test results. These test results were provided to the Navy by Armour of America. Testing at the H.P. White Laboratory was conducted with .30 caliber, APM2 ammunition, at 30° obliquity. A velocity of 2891 feet per second was recorded, with a weight of

---

13. This weight represents the original 35% weight reduction in the RFP, and not the more difficult to meet enhancement of a 41% weight reduction, plus or minus 5 lbs., proposed by Armour of America and incorporated into its contract.

7.52 lbs./sq ft, rather than the required, higher 2900 feet per second, and the required, lower weight of 6.79 lbs./sq ft.

On August 24, 2004, Armour of America and the Navy met. Armour of America General Manager Nehmens testified he told the Navy at the August 24, 2004 meeting, "that we needed probably 3 to 4 more weeks, and we would have the situation taken care of." Armour of America President Schreiber recalled that the Navy had suggested using boron carbide, a better quality material, for the armor, but Mr. Schreiber thought boron carbide was too expensive, particularly since Armour of America had discounted its price to the Navy for the LWARS contract. The view of Navy Program Manager Colonel Bauman of the August 24, 2004 meeting was reflected in an August 24, 2004 email he sent to Navy officials. The email noted that a cure notice had been sent to Armour of America three weeks earlier, and that Armour of America had presented their test results which had not met the 35% weight reduction. Colonel Bauman also indicated: "AoA stated if they only had a little more time of 4 weeks, they could possibly make the weight. Our collective feeling is that they have been given opportune [sic] time. On the intangible side, my technical team has lost confidence in their ability to keep their word about simple things as meetings, phonecons and providing documentation in a timely manner."

On August 26, 2004, after the August 25, 2004 deadline in the cure notice had passed, the Navy's contracting officer, Janice Woehrer, issued Armour of America a notice of the termination of the contract for default, pursuant to Federal Acquisition Regulation (FAR) 52.249–8, Default (Fixed–Price Supply and Service) (Apr. 1984). The Navy stated that the termination for default was based on Armour of America's failure to make progress, which endangered completion of the LWARS contract. The termination notice was based on Armour of America's inadequate response to the Navy's July 30, 2004 cure notice, and plaintiff's failure to make progress to meet the contract weight and ballistics requirements, including the reduction to a "maximum weight of 6.79 lbs/square feet," and at least a "V50 [sic] ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at 30–degree angle of obliquity." Armour of America's LWARS contract was terminated on August 26, 2004, about two and one-half months after award, with about two and one-half months remaining on the contract for Armour of America to deliver the QTAs.

Despite the August 26, 2004 termination for default, Armour of America continued testing. Armour of America submitted the following test results for the record. The August 2004 test results are juxtaposed with milestone contract events, such as the cure date and termination date. All tests involved the use of silicon carbide, .30 caliber APM2 ammunition, 30° obliquity, and independent testing by H.P. White Laboratory, except for Test No. 1, which appears to be an internal Armour of America test. The comparison of these test results is with the contract required velocity of 2900 feet per second, and a weight reduction to 6.79 lbs./sq ft. None of the tests met both the velocity and weight requirements of the contract.

| Event/Test No. | Test Date | Velocity (fps) | Weight (lbs./sq ft) |
| --- | --- | --- | --- |
| Contract Award | 6/10/2004 | 2900 requirement | 6.79 requirement |
| Program Mgmt. Rev. | 7/14/2004 | | |
| Test No. 1 | 7/27/2004 | 2783 | 6.79 |
| Cure Notice | 7/30/2004 | | |
| Test No. 2 | 8/10/2004 | 2527 | 9.87 |
| Test No. 3 | 8/18/2004 | 2763 | 8.46 |

| Test No. 4 | 8/23/2004 | 2891 | 7.52 |
|---|---|---|---|
| Cure Date | 8/25/2004 | | |
| Default | 8/26/2004 | | |
| Test No. 5 | 9/03/2004 | 2976 | 7.55 |
| Test No. 6 | 9/24/2004 | 2940 | 7.08 |
| Test No. 7 | 10/05/2004 | 2982 | 7.05 |
| QTAs Due | 11/10/2004 | | |

After termination of Armour of America's contract for default, the Navy asked all the previous bidders if they would like their bids to be considered for the reprocurement. The requirements of the RFP, except for period of performance, remained the same. The Navy awarded a reprocurement contract to intervenor ArmorWorks, on November 5, 2004. The RFP weight requirement was for a minimum 35% weight reduction. Armour of America's contract contained an enhancement of a 41% +/- 5 pound weight reduction. ArmorWorks offered, as an enhancement, a 40% +/- 5 pound weight reduction, which was incorporated into the reprocurement contract. The basic ballistics requirements remained the same in the RFP, Armour of America's contract, and ArmorWorks' reprocurement contract. The RFP required that the LWARS be able to "withstand multiple ballistic impacts." Armour of America had offered an enhancement, that the LWARS would be able to withstand multiple ballistics impacts of 3 equidistant hits in a 3 inch circle, which was incorporated into its contract. ArmorWorks offered an enhancement that the LWARS would be able to withstand multiple ballistics impacts spaced six inches apart or greater, which was incorporated into the reprocurement contract. ArmorWorks successfully completed the LWARS contract. As a result of performance by the reprocurement contractor, in a counterclaim, defendant seeks $1,507,438.00 in reprocurement costs from the plaintiff. In its counterclaim, defendant also seeks $45,630.00 in administrative costs related to the reprocurement.

## DISCUSSION

*LWARS Weight and Ballistics Requirements*

Plaintiff, Armour of America's amended complaint charges bad faith and abuse of discretion on the part of the Navy for: a) "awarding the contract to AOA [Armour of America] knowing a patent ambiguity existed with AOA's bid," b) "by awarding AOA a contract despite their non-conforming bid," and c) "ignoring their [the Navy's] own recommendations to mitigate 'weaknesses' in AOA's proposal." These charges appear to stem from the proposal by plaintiff to use KSP–60 as the armor material. Armour of America's proposal submitted a list of ammunition which KSP–60 armor could defeat, but the .30 caliber armor piercing round at 2900 feet per second required by the Statement of Work was not in Armour of America's proposal.

As to the rules of law to be applied to the issues presented by plaintiff, and in particular Armour of America's assertion in the First Cause of Action of its amended complaint that there was a "patent ambiguity," "[c]ontract interpretation is a question of law." *See H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed.Cir.1998) (stating that matters of contract interpretation are questions of law); *see also Holland v. United States*, 621 F.3d 1366, 1374 (Fed.Cir.2010); *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1996); *C.W. Over & Sons, Inc. v. United States*, 54 Fed. Cl. 514, 520 (2002).

Contract interpretation starts with analysis of the language of the written agreement. *See Foley Co. v. United States*, 11 F.3d 1032,

1034 (Fed.Cir.1993). The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States* that:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

*Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted); *McHugh v. DLT Solutions, Inc.*, 618 F.3d 1375, 1380 (Fed.Cir.2010); *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340–41 (Fed.Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances."); *Enron Fed. Solutions, Inc. v. United States*, 80 Fed.Cl. 382, 393 (2008) ("[C]ontext defines a contract and the issues deriving thereof."). " ' "In contract interpretation, the plain and unambiguous meaning of a written agreement controls." The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.' " *Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1379 (Fed.Cir.2009) (quoting *Hercules Inc. v. United States*, 292 F.3d 1378, 1380–81 (Fed.Cir.2002) (quoting *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed.Cir.1991))); *see also Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed.Cir.2006) (citations omitted); *Medlin Constr. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed.Cir.2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed.Cir.2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous").

" '[I]t has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation.' " *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed.Cir.1988) (quoting *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct.Cl.1971)); *Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562, 1565 (Fed.Cir.1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); *see also Flexfab, LLC v. United States*, 424 F.3d 1254, 1262 (Fed.Cir.2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer...."). When the terms of a contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. *See Teg–Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed.Cir.2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed.Cir.2003))); *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 824 (Fed.Cir.2010), *reh'g and reh'g en banc denied* (Fed.Cir.), *petition for cert. filed*, 79 U.S.L.W. 3141 (U.S. Sept. 8, 2010); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed.Cir.2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."); *King v. Dep't of Navy*, 130 F.3d 1031, 1033 (Fed.Cir.1997) ("If ambiguity is found, or if ambiguity has arisen

during performance of the agreement, the judicial role is to implement the intent of the parties at the time the agreement was made."); *Sea–Land Serv., Inc. v. United States,* 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *See Cruz–Martinez v. Dep't of Homeland Sec.,* 410 F.3d 1366, 1371 (Fed.Cir.2005) (" '[M]eaning can almost never be plain except in a context.' " (quoting *Restatement (Second) of Contracts* § 212, cmt. b (1981))); *Barron Bancshares, Inc. v. United States,* 366 F.3d at 1375 (holding that extrinsic evidence is permissible to interpret an ambiguous contract); *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972); *Commonwealth Edison Co. v. United States,* 56 Fed. Cl. 652, 662 (2003).

■ There are limitations, however, on the use of extrinsic evidence. For example, extrinsic evidence can be used to interpret an agreement in a manner that gives meaning to all its provisions. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed. Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1996). But extrinsic evidence "may not be used 'to justify reading a term into an agreement that is not found there.' " *Warren v. Office of Pers. Mgmt.,* 407 F.3d 1309, 1314 (Fed.Cir.2005) (quoting *Fox v. Office of Pers. Mgmt.,* 100 F.3d 141, 145 (Fed.Cir.1996)); *see also McAbee Constr., Inc. v. United States,* 97 F.3d at 1434 ("[E]xtrinsic evidence ... should not be used to introduce an ambiguity where none exists." (quoting *Interwest Constr. v. Brown,* 29 F.3d 611, 615 (Fed.Cir.1994))). "The parol evidence rule provides a further limitation on the use of extrinsic evidence in interpreting contracts. Under the parol evidence rule, extrinsic evidence pre-dating a written agreement may not be used 'to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding.' " *Teg–Paradigm Envtl., Inc. v. United States,* 465 F.3d at 1338–39 (quoting *Barron Bancshares, Inc. v. United States,* 366 F.3d at 1375); *see also David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 423, 557 F.2d 249, 258 (1977) ("[T]he task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court.").

■ The court, therefore, first must ascertain whether the language at issue was ambiguous. *See NVT Techs., Inc. v. United States,* 54 Fed.Cl. 330, 335 (2002) (finding that the threshold question is whether the document in question contains ambiguous language.), *aff'd,* 370 F.3d 1153 (Fed.Cir. 2004). The United States Court of Appeals for the Federal Circuit has stated that, "[t]o show an ambiguity [in contract language,] it is not enough that the parties differ in their respective interpretations of a contract term." *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004). In order to demonstrate ambiguity, the interpretations offered by both parties must fall within a "zone of reasonableness." *Id.* (quoting *Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999)); *see also Ace Constructors, Inc. v. United States,* 499 F.3d 1357, 1361 (Fed.Cir.2007) ("[I]n interpreting a solicitation, '[it] is ambiguous only if its language is susceptible to more than one reasonable interpretation.... If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning.' " (quoting *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1353 (Fed.Cir.2004))). In *States Roofing Corp. v. Winter,* 587 F.3d 1364 (Fed.Cir. 2009), the court stated the legal test for when a contractor is required to inquire and resolve an ambiguity, or, fail to inquire and waive its claim:

A "patent ambiguity" is one that is "obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start." *H & M Moving, Inc. v. United States,* 204 Ct.Cl. 696, 499 F.2d 660, 671 (1974). As explained in *Grumman Data Systems Corp. v. Dalton,* "a patent ambiguity does not exist where the ambiguity is neither glaring nor substantial nor patent-

ly obvious." 88 F.3d 990, 997 (Fed.Cir. 1996) (internal quotation marks omitted). *See generally WPC Enters. [Inc. v. United States]*, [163 Ct.Cl. 1,] 323 F.2d [874,] 877 [ (1963) ] ("Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in provisions, he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation.").

*States Roofing Corp. v. Winter*, 587 F.3d at 1372; *see also NVT Techs., Inc. v. United States*, 370 F.3d at 1162 ("If the ambiguity is patent, it triggers a duty to inquire."). The Federal Circuit also has indicated that "a proper technique of contract interpretation is for the court to place itself in the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract." *H.B. Mac, Inc. v. United States*, 153 F.3d at 1345.

Armour of America alleges that when it was awarded the LWARS contract, which included weight and ballistics design specifications, on June 10, 2004, plaintiff's proposal relied on the use of KSP–60 material. Remarkably, Armour of America argues that it was not until the July 14, 2004 Program Management Review with the Navy that it understood it had to meet the weight and ballistics requirements contained in the contract. The Navy's basic ballistics requirements, however, did not change from the RFP to the contract. Both the RFP and the contract Armour of America signed explicitly stated that "[t]he LWARS shall be capable of at least a $V_{50}$ ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at 30–degree angle of obliquity." This language is found in paragraph "4.1 *LWARS Requirements (CLIN 0001)*." (emphasis in original). This same paragraph 4.1 was modified by the weight enhancement proposed by Armour of America. The RFP stated that "[t]he LWARS shall provide, at a minimum, a 35% reduction in areal density over the existing metallic armor system...." The contract executed by Armour of America stated that "[t]he LWARS shall provide, at a minimum, a 41% +/- 5 lbs. reduction in areal density over the existing metallic armor sys-

tem," thereby reflecting Armour of America's own proposed enhancement of the weight reduction requirements. Paragraph 4.1, therefore, was not a dormant part of the specifications, but a paragraph, amended in Armour of America's contract, which preserved the ballistics requirements of the solicitation. Armour of America's view of the contract effectively excises these weight and ballistics requirements from its contract with the Navy and attempts to substitute in their place whatever weight and ballistics capabilities KSP–60 was capable of accomplishing. Assuming, without discussing the matter with the Navy, that the weight and ballistics requirements could be ignored and need not be met, was exceedingly risky behavior on the part of Armour of America, an experienced government contractor.

Plaintiff nevertheless argues that there was no meeting of the minds on the Navy's ballistics requirements, and that the first time plaintiff realized that the Navy was insisting on the ballistics requirements in the Statement of Work was during the July 14, 2004 Program Management Review. The court, however, finds that the words of the minimum contract specifications on weight and ballistics were clear and there was no ambiguity in the RFP or in Armour of America's contract regarding the minimum weight and ballistics requirements.

Neither the RFP nor Armour of America's contract was modified to change or relax the ballistics requirements. As noted above, a potential contractor has the duty to inquire of and seek clarification from the procurement agency of "a major patent discrepancy, or obvious omission, or a drastic conflict in provisions...." *States Roofing Corp. v. Winter*, 587 F.3d at 1372 (quoting *WPC Enters., Inc. v. United States*, 163 Ct. Cl. 1, 6, 323 F.2d 874, 877 (1963)). If Armour of America thought the requirements were ambiguous or impossible, or that plaintiff did not intend to comply with the explicit ballistics weight requirements in the contract, it should have so informed the Navy before signing the contract. Furthermore, permitting Armour of America to ignore the basic ballistics requirements in the RFP and in its

contract would be blatantly unfair to the other offerors who had proposed to those same requirements in the RFP and who may have offered a lower price if the requirements could be modified at will, as well as unfair to potential contractors who did not make an offer in response to the solicitation, but might have bid had the requirements been relaxed.

Test results in the record indicate that Armour of America's KSP–60 material achieved success against a number of threats; however, there were no test results reflecting success against the required Statement of Work's particular .30 caliber ballistics threat. In fact, plaintiff's counsel stated that Armour of America "did not utilize KSP–60 to meet the solicitation ballistics specifications but instead to exceed the solicitation weight reduction requirements because the solicitation stated that weight reduction was the most important factor." At his deposition, Armour of America's President, Mr. Schreiber, was asked by government counsel whether he had "a solution at the time you submitted your proposal to meet both the weight specification and the ballistic specification?" Mr. Schreiber's response was that he "had a solution to the weight," and also to MIL–SPEC [14] ballistics requirements in the RFP, but not to the ballistics requirements at issue in the RFP and the same ballistics requirements in Armour of America's contract. Plaintiff, therefore, went forward without a basis for compliance with the ballistics requirements in the Statement of Work, even though the ballistics requirements were not changed or relaxed in either the RFP or plaintiff's contract. Under these circumstances, it was unreasonable for plaintiff to proceed to contract award and performance knowing of its intended reliance on KSP–60 armor and plaintiff's knowledge of the ballistics capabilities of KSP–60, without any indication that the ballistics requirements in the Statement of Work could be changed, relaxed or superseded by lesser MIL–SPEC ballistics requirements. In plaintiff's own words from its amended complaint, it believed a "patent

ambiguity existed with AOA's bid." If the discrepancy between plaintiff's KSP–60 armor and the ballistics requirements at issue in the Statement of Work, was "patently obvious" to plaintiff, see Comtrol, Inc. v. United States, 294 F.3d 1357, 1365 (Fed.Cir. 2002), the discrepancy should have been raised by plaintiff and clarified with the Navy prior to signing the contract, rather than plaintiff operating under the assumption that the ballistics requirements would be waived or relaxed. Armour of America's failure to inquire and clarify what it perceived was an apparent discrepancy between the ballistics capabilities of the armor material it intended to use, KSP–60, and the ballistics requirements of the Statement of Work, under the facts and circumstances presented, precludes plaintiff's argument that its failure to make adequate progress on the ballistics requirements stated in the contract's Statement of Work should not be used as a basis for the termination for default.

As to the argument that plaintiff was following a MIL–SPEC rather than the ballistics requirement in the Statement of Work at issue, Armour of America President Schreiber stated that there was a "contradiction" between the ballistics requirements in the RFP and an unspecified military specification, or MIL–SPEC, also listed in the RFP. The ballistics requirements provided for a testing velocity of 2900 feet per second. Mr. Schreiber stated that a MIL–SPEC listed in the RFP provided for a different, unspecified velocity: "the statement that the two [velocities] did not correspond to each other is accurate." Mr. Schreiber also indicated that he believed the 2900 feet per second figure was a "typo," and inaccurate. A MIL–SPEC for lightweight armor, MIL–PRF–46103E,[15] lists a velocity of 2850 fps, rather than the 2900 fps in the ballistics requirements. Defendant explains this difference by noting that the MIL–SPEC with 2850 fps also provides for zero degrees of obliquity, whereas the ballistics requirement with 2900 fps in the RFP and the contract provided for 30° of obliquity. According to the defendant: "Be-

---

14. MIL–SPEC stands for military specification.

15. MIL–PRF stands for military performance specification.

cause the testing requirement in the RFP specified a 30 degree angle of obliquity, a higher testing muzzle velocity, that is 2900 fps, was required to ensure the same level of ballistics protection as would be demonstrated by testing at zero degree angle of obliquity at a lower muzzle velocity [that is, 2850 fps]." [16]

The RFP provides that MIL–PRF–46103E and other MIL–SPECs may be used as a "general guide" in developing a ballistics test plan. Given the differing angle of obliquity between the ballistics requirements (2900 fps) and MIL–PRF–46103E (2850 fps), and the latter describing itself merely as a general guide, the MIL–SPEC provides no justification for ignoring the ballistics requirement of 2900 fps in the RFP and plaintiffs contract. In any event, before using MIL–PRF–46103E as a basis for ignoring the 2900 fps requirement, which could affect the stopping power of the armor, plaintiff had a duty to inquire of the Navy as to the testing velocity. "[I]t would seem that the obligation to seek clarification as to a patent ambiguity is inherent.... [Contractors] are obligated to bring to the Government's attention major discrepancies or errors which they detect in the specifications or drawings, or else fail to do so at their peril." *Blount Bros. Constr. Co. v. United States*, 171 Ct.Cl. 478, 496, 346 F.2d 962, 972–73 (1965).

Merely by proposing KSP–60, Armour of America argues that the Navy was thereby "stuck" with KSP–60's capabilities, whether or not the material could meet the requirements of the Statement of Work. Armour of America relies on the stated importance of weight reduction in the RFP. For proposal evaluation purposes, the Technical subfactors were: Weight Reduction, Ballistics, Environmental Compatibility, Fit, and Technical Capability. As plaintiff notes, weight reduction was more important than the other four subfactors combined. Armour of America proposed an enhancement on weight reduction, which was accepted by the Navy and written into the contract. However, the importance of weight reduction and the acceptance of Armour of America's weight reduction enhancement by the Navy did not rescind the contract's stated ballistics requirements. The Navy did not delete or relax the ballistics requirements, but retained these requirements intact in Armour of America's contract. Armour of America's theory might have more credibility had its KSP–60 proposal been explicitly incorporated into the contract, and the ballistics requirements in the contract explicitly deleted or modified to fit KSP–60's ballistics requirements. In fact, KSP–60's weight reduction capabilities were explicitly incorporated into the contract, but KSP–60's ballistics capabilities were not explicitly incorporated, and Armour of America's proposal to use KSP–60 was not incorporated into the contract.

Mr. Schreiber, Armour of America's President, was asked by government counsel to assume that the Navy "knew you had this KSP–60 and it could meet certain ballistics threats and it could reduce the weight by a certain amount. I'm just asking whether, under those circumstances, is it unreasonable for the Navy to assume that Armour of America, based on its vast experience in designing armor, could take that KSP–60 and make it even better?" Mr. Schreiber's response to the question was, "It's unreasonable to assume that they could—that we could do that." However, rather than the Navy implicitly signing up to the limitations in the capabilities of KSP–60, and thereby effectively excising the Statement of Work's

---

**16.** Defendant's expert, Dr. Charles Anderson, Jr., further explained:

it might be asked why a higher-than-nominal-muzzle velocity was specified in the Government requirements. For a specific armor design, a $V_{50}$ velocity means that the target does not stop all threats, but that there are instances of perforated armor (in theory, 50% of the time). The original specification stated that the ballistic protection be "capable of defeating a .30 caliber APM2 threat with no complete armor penetrations at an impact velocity of 2750 ft/s at zero angle of obliquity." It takes many tests, depending upon the reliability required, to demonstrate no complete penetrations. On the other hand, $V_{50}$ determinations are straightforward and can be done with a minimum of tests. To insure that the armor will completely defeat the threat (no perforations), the ballistic performance objective ($V_{50}$ determination) is established at a higher impact velocity. In this manner, the armor can now defeat all impacts at the nominal muzzle velocity, (footnotes omitted).

ballistics requirements, the RFP provided that offerors were required to submit sufficient information "to enable Government personnel to fully ascertain capabilities of the offeror to perform the requirements." The RFP did not require offerors, previously, to have developed armor material that would meet the LWARS weight and ballistics requirements. Offerors had to demonstrate their capability to achieve the stated requirements. CLIN 0001 of the contract, LWARS Non–Recurring Engineering, was for the purpose of designing, developing and testing armor material. The LWARS contract provided a five-month period after contract award for the design, development and testing phase. In this regard, Armour of America's proposal to use KSP–60 material was not incorporated into its contract with the Navy. According to the Source Selection Evaluation Board and the Source Selection Authority, Armour of America was awarded the best value, LWARS contract based on a Highly Satisfactory Technical rating with Medium proposal Risk, which included aggressive weight reduction; Low performance Risk based on successful past performance; and the lowest price among the four offerors in the competitive range with a Satisfactory or better proposal rating. Under these facts and circumstances, and given the clearly articulated contract requirements, the Navy had a reasonable basis for selecting plaintiff as the awardee and believing that Armour of America could work towards and achieve the stated weight and ballistics requirements articulated in the RFP and the contract.

The initial evaluation of the Ballistics subfactor for Armour of America was Unsatisfactory, with High Risk. The initial, overall Technical evaluation of Armour of America's proposal was Highly Satisfactory, with Medium Risk. For the final Technical Evaluation, Armour of America's Ballistics Technical subfactor was Satisfactory, with High Risk. The overall, final technical rating remained Highly Satisfactory, with Medium Risk. The Source Selection Authority, in awarding the contract to Armour of America, stated that the final proposal evaluation Risk of Medium "could be mitigated through close Government's [sic] involvement and oversight of the program."

Armour of America's amended complaint, in attempting to support its allegations of agency failures in contract administration, stated that the Navy ignored its own "recommendations to mitigate 'weaknesses' in AOA's proposal." The record, however, indicates otherwise. The Source Selection Authority, Carole Tisone, and Contracting Officer, Janice Woehrer, both testified about weekly telephone calls between the Navy and Armour of America, reflecting ongoing Navy involvement and oversight. Navy personnel suggested to Armour of America that boron carbide or silicon carbide be used as armor material rather than KSP–60. Navy personnel even assisted Armour of America with preparation of a Qualification Test Plan, for ballistics testing. The July 14, 2004 Performance Management Review was held a little over a month after contract award on June 10, 2004. Paul Fitzgerald, Deputy Assistant Program Manager for the CH–46E Helicopter Program Office, testified that meetings with Armour of America personnel were set up every Tuesday, starting with the first Tuesday after the Performance Management Review. The record reflects reasonable, and frequent involvement, assistance and oversight of Armour of America by the Navy.

*Termination for Default*

On August 26, 2004, Navy Contracting Officer Woehrer issued a notice of termination of plaintiffs contract to Armour of America, pursuant to the Default clause in the contract. The Default provision of plaintiffs contract, FAR 52.249–8, Default (Fixed–Price Supply and Service) (Apr. 1984), provides that:

(a)(1) The Government may, subject to paragraphs (c) and (d) below, by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to—

(i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

(iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).

(2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

(b) If the Government terminates this contract in whole or in part, it may acquire, under the terms and in the manner the Contracting Officer considers appropriate, supplies or services similar to those terminated, and the Contractor will be liable to the Government for any excess costs for those supplies or services. However, the Contractor shall continue the work not terminated.

(c) Except for defaults of subcontractors at any tier, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include (1) acts of God or of the public enemy, (2) acts of the Government in either its sovereign or contractual capacity, (3) fires, (4) floods, (5) epidemics, (6) quarantine restrictions (7) strikes, (8) freight embargoes, and (9) unusually severe weather. In each instance the failure to perform must be beyond the control and without the fault or negligence of the Contractor.

(d) If the failure to perform is caused by the default of a subcontractor at any tier, and if the cause of the default is beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either, the Contractor shall not be liable for any excess costs for failure to perform, unless the subcontracted supplies or services were obtainable from other sources in sufficient time for the Contractor to meet the required delivery schedule.

(e) If this contract is terminated for default, the Government may require the Contractor to transfer title and deliver to the Government, as directed by the Contracting Officer, any (1) completed supplies, and (2) partially completed supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights collectively referred to as manufacturing materials in this clause) that the Contractor has specifically produced or acquired for the terminated portion of this contract. Upon direction of the Contracting Officer, the Contractor shall also protect and preserve property in its possession in which the Government has an interest.

(f) The Government shall pay contract price for completed supplies delivered and accepted. The Contractor and Contracting Officer shall agree on the amount of payment for manufacturing materials delivered and accepted and for the protection and preservation of the property. Failure to agree will be a dispute under the Disputes clause. The Government may withhold from these amounts any sum the Contracting Officer determines to be necessary to protect the Government against loss because of outstanding liens or claims of former lien holders.

(g) If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

(h) The rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract.

In short, the Default clause in plaintiffs contract stated that the government may, by written notice to the contractor, terminate the contract in whole or in part, "if the Contractor fails to—... (ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below)[.]" 48 C.F.R. § 52.249–8(a)(1)(ii), Default (Fixed–Price Supply and Service) (Apr. 1984). The referenced subparagraph (a)(2) of the Default clause stated that the government's right to terminate the contract, "may be exercised if the Contractor does not cure such failure within 10 days (or more if au-

thorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure." 48 C.F.R. § 52.249–8(a)(2). In the instant case, Navy Source Selection Authority Tisone [17] issued a cure notice to Armour of America on July 30, 2004, stating that contract completion was endangered, and giving Armour of America until August 25, 2004 to cure, or face the possibility of termination for default. Unsatisfied with Armour of America's progress and ability to complete the contract, on August 26, 2004, twenty-seven days after the cure notice was issued, Contracting Officer Woehrer issued Armour of America a notice of default termination.

The United States Court of Appeals for the Federal Circuit, in one of the many decisions in the *McDonnell Douglas* case, addressed the issues to consider in a termination of a contract for default, with the termination based on the contractor's failure to make progress, thereby endangering completion of the contract, as in the present case. Although the Federal Circuit cautioned, in its latest *McDonnell Douglas* opinion, that the result is driven by the unique facts of the *McDonnell Douglas* case, the case is instructive. *See McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1356 (Fed.Cir.) (designated by the Federal Circuit as *McDonnell Douglas XIV*), *reh'g and reh'g en banc denied* (Fed.Cir. 2009), *cert. granted in part sub nom. Gen. Dynamics Corp. v. United States*, — U.S. —, 131 S.Ct. 62, 177 L.Ed.2d 1151 (2010) and *sub nom. Boeing Co. v. United States*, — U.S. —, 131 S.Ct. 62, 177 L.Ed.2d 1151 (2010) (grant of petitions for writ of *certiorari* limited to questions on the state secrets privilege, *see* peti-

tions, *Gen. Dynamics Corp. v. United States*, No. 09–1298, 2010 WL 1698039, at *i no. 1 (U.S. Apr. 23, 2010) and *Boeing Co. v. United States*, No. 09–1302, 2010 WL 1698042, at *i no. 2 (U.S. Apr. 23, 2010)).

In *McDonnell Douglas XIV*, the Navy issued a cure notice, then a termination for default notice, for failure to "[p]rosecute the work so as to endanger performance of this contract...." *McDonnell Douglas XIV*, 567 F.3d at 1343, 1345.[18] Among other relief, McDonnell Douglas sought to convert the termination for default into a termination for the convenience of the government, as Armour of America seeks to do in the present case. *See id.* at 1345.

In describing the function of a cure notice, the Federal Circuit stated that:

> The cure notice lets a contractor know that even if performance or delivery is not yet due, the contracting officer believes the contractor may not be making sufficient progress to complete the contract on time. The burden is then on the contractor to advise the Government how it will complete the project on time, according to contract requirements.

*Id.* at 1350 (quoting *Universal Fiberglass Corp. v. United States*, 210 Ct.Cl. 206, 537 F.2d 393 (1976)).

The Federal Circuit held in *McDonnell Douglas XII* that a default termination required the government to establish by a preponderance of the evidence a "reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance." *McDonnell Douglas*

---

**17.** Ms. Tisone signed the cure notice as a contracting officer for the Naval Air Systems Command.

**18.** Although the 1984 Default clause in the *McDonnell Douglas XIV* case was for a fixed-price research and development contract, and the 1984 Default clause in the Armour of America case was for a fixed-price supply contract, the concept of endangering contract completion is common to both Default clauses. *See* 48 C.F.R. § 52.249–9, Default (Fixed–Price Research and Development) (Apr. 1984); 48 C.F.R. § 52.249–8, Default (Fixed–Price Supply and Service) (Apr. 1984). These April 1984 Default clauses remain

the same standard clauses used in government contracts awarded today. Also of interest to the instant case, the opinion designated by the Federal Circuit as *McDonnell Douglas XII*, *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2003), relied on the endangered completion rule in *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987). *Lisbon* involved not a research and development contract, as in the *McDonnell Douglas* case, but a construction contract with comparable endangered completion language as in the case before this court. *See id.* at 762.

*XII,* 323 F.3d at 1016 (quoting *Lisbon Contractors, Inc. v. United States,* 828 F.2d at 765 (quoting *Appeal of RFI Shield–Rooms,* ASBCA Nos. 17374, 17991, 77–2 BCA ¶ 12,714, at 61,735 (Aug. 11, 1977))) (internal quotation marks and brackets omitted).

The Federal Circuit, in *McDonnell Douglas XII,* further summarized the rule, as follows:

> once the Court of Federal Claims determines the performance required by the contract and the contract completion date, it can then decide, in light of the information upon which the contracting officer relied in deciding to terminate for default, whether the government has met its burden of proving that the contracting officer had a reasonable belief that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for performance.

*McDonnell Douglas XII,* 323 F.3d at 1018 (footnote omitted). The *McDonnell Douglas* court also stated: " '[A] court's review of a default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry.' " *McDonnell Douglas XIV,* 567 F.3d at 1355 (quoting *McDonnell Douglas XII,* 323 F.3d at 1016).

In *McDonnell Douglas XIV,* 567 F.3d at 1347–48, the Federal Circuit found that the *Lisbon* test for default when the contractor's poor performance endangers contract completion was "difficult to apply" in the *McDonnell Douglas* case, because of the absence of a contract completion date in that case. *See McDonnell Douglas XIV,* 567 F.3d at 1347. The Federal Circuit continued:

> The contractors [in *McDonnell Douglas*] would have us apply the *Lisbon* test literally and hold that the absence of a contract completion date *per se* precludes the government from ever justifiably terminating a contract for failure to make progress. We cannot adopt such a broad categorical rule. The propriety of such a default termination, even though ultimately a question of law, is a fact-sensitive inquiry. The *Lisbon* test requires the contracting officer's *reasonable* belief that there was no *reasonable* likelihood of timely completion.

*Lisbon,* 828 F.2d at 765. Therefore, it is inevitable that some case-by-case adjudication is required.

To be sure, just as the prior panel did, we reaffirm that the test formulated in *Lisbon* is a correct standard for determining whether a default termination for failure to make progress is justified. However, this test was announced in view of the specific facts presented in that case, where there was a definite contract completion date. *Lisbon,* 828 F.2d at 761, 762. It did not address the situation where, as in the present case, the contract does not specify a fixed completion date. As such, the *Lisbon* standard could not be literally applied in every default termination for failure to make progress case.

. . .

Instead, we favor an ad hoc, factual inquiry that allows careful examination and weighing of all relevant circumstances. *See McDonnell Douglas XII,* 323 F.3d at 1014 (stating that "[i]n determining whether a default termination was justified, a court must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues").

In fact, in our 2003 opinion [*McDonnell Douglas XII* ], we provided the same guidance, stating that to determine whether a default termination is justified, "the trial court should focus on the events, actions, and communications leading to the default decision in ascertaining whether the contracting officer had a reasonable belief that there was no reasonable likelihood of timely completion." *McDonnell Douglas XII,* 323 F.3d at 1017. Of course, in some cases, it is possible that a conclusion drawn from a comparison of the entire contract effort and the time remaining for contract performance is so clear that it becomes dispositive. *See Lisbon,* 828 F.2d at 765. However, in cases such as the present one, where such a comparison is inapplicable, the court must examine other factors, including the contractor's failure to meet progress milestones, its problems with subcontractors and suppliers, its financial situation, and its performance history. *See*

*McDonnell Douglas XII*, 323 F.3d at 1017. Only after analyzing the totality of the circumstances can a court determine whether a contractor failed to "[p]rosecute the work so as to endanger performance" of the contract. *See* 48 C.F.R. § 52.249-9. *McDonnell Douglas XIV*, 567 F.3d at 1348, 1350–51 (citation omitted; emphasis in original; brackets added). The Federal Circuit concluded that the contracting officer in *McDonnell Douglas XIV* "was reasonably justified in feeling insecure about the contractors' rate of progress," and that the government had "satisfied its burden to justify the default termination." *Id.* at 1353 (footnote omitted); *see also id.* at 1354 ("[T]he government was justifiably insecure about the contract's timely completion," and "we are less concerned about the label of the contracting officer's action so long as, in fulfilling his duty, the contracting officer exercised reasoned judgment and did not act arbitrarily.").

In reviewing the propriety of the *McDonnell Douglas* termination for default in which there was no contract completion date, the Federal Circuit stated that it favors "an ad hoc, factual inquiry that allows careful examination and weighing of all relevant circumstances." *Id.* at 1350. " 'In determining whether a default termination was justified, a court must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues.' " *Id.* (quoting *McDonnell Douglas XII*, 323 F.3d at 1014). Furthermore, "the trial court should focus on the events, actions, and communications leading to the default decision in ascertaining whether the contracting officer had a reasonable belief that there was no reasonable likelihood of timely completion." *McDonnell Douglas XIV*, 567 F.3d at 1350 (quoting *McDonnell Douglas XII*, 323 F.3d at 1017). The Federal Circuit concluded, "[o]nly after analyzing the totality of circumstances can a court determine whether a contractor failed to '[p]rosecute the work so as to endanger performance' of the contract." *McDonnell Douglas XIV*, 567 F.3d at 1351 (quoting the Default clause in *McDonnell Douglas XIV*, FAR 52.249-9, which contained similar language to the Default clause

in Armour of America's contract, FAR 52.249-8, with FAR 52.249-8 requiring the court to determine whether a contractor failed to "[m]ake progress, so as to endanger performance of this contract.").

The Federal Circuit re-emphasized in *McDonnell Douglas XIV*, "that the government bears the burden of justifying the propriety of a default termination." *McDonnell Douglas XIV*, 567 F.3d at 1351 (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d at 765). The Federal Circuit also stated:

> We also stated that "the contracting officer's termination decision [must] be based on tangible, direct evidence reflecting the impairment of timely completion." *McDonnell Douglas XII*, 323 F.3d at 1016 (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d at 766).... The direct evidence also includes the "contracting officer's testimony and contemporaneous documents." *McDonnell Douglas XII*, 323 F.3d at 1016.

*McDonnell Douglas XIV*, 567 F.3d at 1351 (brackets in original); *see also LB&B Assocs. Inc. v. United States*, 91 Fed.Cl. 142, 154–55, 157 (2010). Once the government has met its burden of justifying the propriety of a default termination, the contractor has the burden of going forward with the evidence to demonstrate that it was making progress, or that there was an excusable delay. *McDonnell Douglas XIV*, 567 F.3d at 1353.

There are both milestones and a contract completion date in the present case. Armour of America was issued a cure notice on July 30, 2004, which gave plaintiff until August 25, 2004 to relieve the contracting officer's concerns that plaintiff could not meet the delivery date for the QTAs of November 10, 2004. Since there was a contract completion date in plaintiff Armour of America's case, the court will review the default termination under the *Lisbon* test. The government, therefore, must establish by a preponderance of evidence a reasonable belief on the part of the contracting officer that there was no reasonable likelihood that Armour of America could complete the contract within the time remaining for contract performance. *See Lisbon Contractors, Inc. v. United States*, 828

F.2d at 765; *see also McDonnell Douglas XII,* 323 F.3d at 1016. As addressed below, the court finds that the government has met its burden under this traditional test to justify the default termination. Similarly, even were the court to apply the modified test adopted by the Federal Circuit in *McDonnell Douglas XIV,* which calls for an "ad hoc, factual inquiry," and which analyzes the "totality of the circumstances," and determines whether the government was "justifiably insecure about the contract's timely completion," the government's default termination of Armour of America's contract also was justified. *See McDonnell Douglas XIV,* 567 F.3d at 1350–51, 1354.

Source Selection Authority Tisone issued the following cure notice to Armour of America:

> You are hereby notified that the Government considers your failure to successfully demonstrate that your Light Weight Armor Replacement System (LWARS) product meets the basic requirements of contract N00019–04–C–3147, to be a condition that is endangering performance of the contract. Therefore, unless this condition is cured to the Government's satisfaction by 25 August 2004, the government may terminate for default under the terms and conditions of the Default (Fixed–Price supply and Service) (APR 1984) clause 52.249–8.

The cure notice required the following actions, under threat of the possibility of a termination for default:

1. Demonstrate via an independent laboratory or test facility that the LWARS product meets or is less than the maximum weight of 6.79 lbs./sq ft. Provide test results to substantiate your proposed material is capable of at least a V50 [sic] ballistic limit of 2900 feet per second against a .30 cal APM2 threat at 30–degree angle of obliquity.

2. Demonstrate that the LWARS product will meet or exceed all other test requirements of the contract, especially Environmental and Vibration requirements. This can be done via actual test data or through preliminary analysis of the proposed material.

3. Provide specific detail on maintenance requirements for the new LWARS material.

4. Provide the samples which have already been tested to PMA–226 for further analysis. The samples requested are those that demonstrated success and which meet or exceed the weight requirements of the contract. These samples should be shipped in the most expeditious manner to the following: [place of business omitted].

5. Provide any information with regard to any enhancements this material may provide over and above the minimum requirements provided in the original RFP. . . .

At closing argument, Armour of America provided test results based on its use of silicon carbide as an armor material, rather than KSP–60. Test No. 1, shown in the chart below, was conducted three days prior to issuance of the Navy's cure notice and, according to Armour of America, met the Navy's weight reduction requirement of 6.79 lbs./sq ft, but not the velocity requirement of 2900 fps. Test No. 1, however, was performed by Armour of America itself, and not by an independent testing facility, as required by the cure notice. Test Nos. 2, 3 and 4, performed between the time of the cure notice and the August 25, 2004 date by which Armour of America was to have demonstrated progress in order to cure the Navy's identified concerns, were performed by H.P. White Laboratory, Inc., an independent testing facility. Armour of America met neither the weight reduction nor the velocity requirements in the tests performed by H.P. White Laboratory, as shown in the chart below:

| Event/Test No. | Event/Test Date | Velocity (fps) Requirement: 2900 fps | Weight (lbs./sq ft) Requirement: 6.79 lbs./sq ft |
| --- | --- | --- | --- |
| Test No. 1 | 7/27/2004 | 2783 | 6.79 |

| | | | |
|---|---|---|---|
| Cure Notice | 7/30/2004 | | |
| Test No. 2 | 8/10/2004 | 2527 | 9.87 |
| Test No. 3 | 8/18/2004 | 2763 | 8.46 |
| Test No. 4 | 8/23/2004 | 2891 | 7.52 |
| Cure Date | 8/25/2004 | | |

The cure notice required a demonstration that the armor could meet the RFP requirements: 6.79 lbs./sq ft weight reduction, and $V_{50}$ ballistics limit of 2900 feet per second, against a .30 cal APM2 threat at a 30 degree angle of obliquity. None of the three tests conducted by the independent facility, after issuance of the cure notice, met the weight and ballistics requirements. The test conducted on August 23, 2004, two days before the August 25, 2004 date by which Armour of America was to have cured the Navy's concerns, reflected a velocity of 2891 fps, which was less than the requisite 2900 fps, and the weight shown was 7.52 lbs./sq ft, which was heavier than the maximum weight of 6.79 lbs./sq ft. The weight reduction which Armour of America had originally proposed as an enhancement, had been incorporated by the Navy into plaintiff's contract, and constituted an areal density of 6.1 lbs./sq ft (representing a 41% weight reduction), rather than the 6.79 lbs./sq ft (representing a 35% weight reduction) in the LWARS RFP. The Navy's cure notice, however, did not cite the 6.1 lbs./sq ft enhanced figure, but only the original Statement of Work figure of 6.79 lbs./sq ft. With regard to the velocity requirement, the cure notice stated that Armour of America was to show that "your proposed material is capable of at least a V50 [sic] ballistic limit of 2900 feet per second...." The Navy's August 26, 2004 notice of default termination was based on Armour of America's "failure to make progress which has endangered performance under said contract because your proposed armor material does not meet the following minimum requirements," citing the cure notice, and the 6.79 lbs./sq ft and 2900 fps weight and velocity requirements.

Contracting Officer Woehrer issued a "Contracting Officer's Determination to Issue a Termination for Default to Armour of America Under Contract N00019–04–C–3147," which described the basis for the Navy's default termination. Both the Contracting Officer's Determination to Issue a Termination for Default and the Navy's notice of default termination to Amour of America were dated August 26, 2004. As a threshold matter, plaintiff argues that the government acknowledged actually completing the Contracting Officer's Determination document in the first week of October 2004, then backdating the document to August 26, 2004. In this regard, Contracting Officer Woehrer explained that, after she issued the termination for default letter to Armour of America, she drafted the Contracting Officer's Determination document, and circulated it among Navy engineers, legal advisors and her supervisor, "to ensure that it reflected accurately everything that the consensus of the group had reached." Ms. Woehrer further testified that the document accurately reflected the rationale that she and her team of advisors had used as justification for the default termination issued to the contractor on August 26, 2004. Ms. Woehrer testified that the Determination was dated August 26, 2004, to coincide with the issuance of the termination letter. The Navy's Program Manager, Colonel Mitchell Bauman, testified that, prior to the issuance of the default termination, Navy contract, logistics, engineering and legal personnel "caucused" to determine whether there was adequate justification for the default. Colonel Bauman reported a Navy consensus in support of the default termination. Plaintiff argues that a draft Contracting Officer's Determination to Issue a Termination for Default document was circulated among Navy personnel "to try and find a reason or justification for the termination," and that the backdating of the document to the date of the default termination notice calls into question the "credibil-

ity" and "integrity" of the Navy, and amounts to "bad faith."

The United States Court of Appeals for the Federal Circuit has addressed the standard for a showing of bad faith on the part of the government:

> As an initial matter, government officials are presumed to act in good faith. *See Alaska Airlines, Inc. v. Johnson,* 8 F.3d 791, 795 (Fed.Cir.1993) ("[T]here is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations.... [T]his presumption stands unless there is irrefragable proof to the contrary."). There is no evidence in the record to suggest that DHS [Department of Homeland Security] acted with intent to injure Savantage or any other potential bidder. *See Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1330 (Fed. Cir.2004) ("In the cases where the court has considered allegations of [governmental] bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff.").

*Savantage Fin. Servs. v. United States,* 595 F.3d 1282, 1288 (Fed.Cir.2010) (brackets and omission in original); *see also Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239 (Fed.Cir.2002) ("The presumption that government officials act in good faith is nothing new to our jurisprudence. *See, e.g., Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954) (stating 'we start out with the presumption that the official acted in good faith').").

The Federal Circuit in *Am–Pro Protective Agency* further defined the standard of proof indicated by the phrase "well-nigh irrefragable" proof: "While our court and its predecessor have often used the 'well-nigh irrefragable' language to describe the quality of the evidence required to overcome the good faith presumption, ... we believe that clear and convincing most appropriately describes the burden of proof applicable to the presumption of the government's good faith." *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d at 1239. Also in *Am–Pro Protective Agency,* the Federal Circuit de-

scribed this "clear and convincing" standard of proof as:

> A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. "Clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is *"highly probable."*

*Id.* at 1240 (quoting *Price v. Symsek,* 988 F.2d 1187, 1191 (Fed.Cir.1993)) (internal citations omitted in original and emphasis in original).

Moreover, the Federal Circuit described the type of proof necessary to establish that a government official acted in bad faith by "clear and convincing" evidence, as:

> equated with evidence of some specific intent to injure the plaintiff. Thus, in *Gadsden v. United States,* [111 Ct.Cl. 487, 489–90 (1948),] the court compared bad faith to actions which are "motivated alone by malice." In *Knotts,* [128 Ct.Cl. 489 (1954),] the court found bad faith in a civilian pay suit only in view of a proven "conspiracy ... to get rid of plaintiff." Similarly, the court in *Struck Constr. Co. v. United States,* [96 Ct.Cl. 186, 222 (1942),] found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach,* [*v. United States,* 147 Ct.Cl. 605 (1959),] the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

> ...

> Nothing in Brown's affidavit [whereby *Am–Pro* attempted to show bad faith], moreover, suggests that the government "had a specific intent to injure" Am–Pro. *Caldwell [ & Santmyer, Inc. v. Glickman,]* 55 F.3d [1578,] 1581 [ (Fed.Cir.1995) ]. And Am–Pro has not alleged that these threats were "motivated alone by malice," *Gadsden v. United States,* 111 Ct.Cl. 487, 489, 78 F.Supp. 126 (1948); as part of a proven "conspiracy ... to get rid of [Am–Pro]," *Knotts,* 128 Ct.Cl. at 500, 121 F.Supp. 630;

as part of a course of governmental conduct which was "designedly oppressive," *Struck*, 96 Ct.Cl. at 222; or as "actuated by animus toward" Am–Pro, *Librach*, 147 Ct.Cl. at 614.

*Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1240, 1241 (quoting in part *Kalvar Corp. v. United States*, 211 Ct. Cl. 192, 543 F.2d 1298, 1302 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977)) (citations omitted in original); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir. 2004) (" '[A]llegations of bad faith … ha[ve] been equated with evidence of some specific intent to injure the plaintiff.' " (quoting *Torncello v. United States*, 231 Ct.Cl. 20, 45, 681 F.2d 756, 770 (1982))); *Info. Tech. & Applications Corp. [ITAC] v. United States*, 316 F.3d 1312, 1323 n. 2 (Fed.Cir.) ("*ITAC* has pointed to no record evidence of bias. Instead it has merely reiterated its contentions that the Air Force erred in evaluating the proposals. This is not evidence of bias, and it is insufficient to overcome the presumption that the contracting officer acted in good faith.") (citations omitted), *reh'g and reh'g en banc denied* (Fed.Cir. 2003); *Madison Servs. Inc. v. United States*, 94·Fed.Cl. 501, 507 (2010) ("Because plaintiff submits as evidence unsubstantiated innuendo and uncorroborated inferences, evidence that categorically cannot meet a 'clear and convincing' standard, the court must deny plaintiffs requests for relief.") (citations omitted), *id.* at 511 & 511 n. 8 (adding unreliable hearsay and attorney arguments to the list of what will not meet the standard for demonstrating bad faith); *L–3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed.Cl. 347, 354 (2010) (innuendo or suspicion is not enough to demonstrate bad faith); *North Star Alaska Hous. Corp. v. United States*, 76 Fed.Cl. 158, 187–88 (2007) ("Courts have found bad faith when confronted by a course of government conduct that was 'designedly oppressive,' *Struck Constr. Co. v. United States*, 96 Ct.Cl. 186, 222, 1942 WL 4411 (1942), or that 'initiated a conspiracy' to 'get rid' of a contractor, *Knotts v. United States*, 128 Ct.Cl. 489, 121 F.Supp. 630, 636 (1954).")*, appeal dismissed*, 226 Fed.Appx. 1004 (Fed.Cir.2007).

In the case under review, despite the government's failure to complete the contracting officer's justification for termination for default in a more timely fashion, plaintiff has failed to demonstrate evidence of ulterior motive or bad faith. As a general proposition, it is poor practice to complete and backdate supporting decision documents. Backdating documents certainly requires an explanation for the backdating and raises additional issues beyond the contents of the document itself. The plaintiff argues that the backdating of the Contracting Officer's Determination is evidence of bad faith. The Navy has offered an acceptable explanation, although not demonstrated best practices. The Navy identified in its cure notice the basis for a potential default if the plaintiff failed to take specific actions. Armour of America failed to alleviate the Navy's concerns in a timely fashion. The basis for the default largely followed the concerns identified in the cure notice, as further explained in the August 26, 2004 notice of termination for default and in the August 26, 2004, Contracting Officer's Determination to Issue a Termination for Default to Armour of America Under Contract N00019–04–C–3147. Therefore, although backdating the default determination memorandum resulted in plaintiff's questioning the Navy's motives, the plaintiff has not introduced evidence in the record sufficient to demonstrate bad faith. The applicable regulation, FAR 49.402–5, titled Memorandum by the contracting officer, provides that, when a contract is terminated for default, "the contracting officer shall prepare a memorandum for the contract file explaining the reasons for the action *taken*." 48 C.F.R. § 49.402–5 (2003) (emphasis added). Although the FAR provision directs the contracting officer to document the rationale for the default action for the file, it does not contain a requirement that the memorandum be signed before the notice of default is issued and uses the past tense phrase, "explaining the reasons for the action taken." *Id.* Unlike certain other requirements in the FAR, it therefore appears permissible, albeit poor practice, to write the justification as a memorandum to the file of the "action taken," after the fact. *See* 48 C.F.R. § 49.402–5.

In order to support the termination for default, the government, however, must establish by a preponderance of the evidence a " 'reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance.' " *McDonnell Douglas XIV*, 567 F.3d at 1346 (quoting *McDonnell Douglas XII*, 323 F.3d at 1016) (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d at 765). The record before the court reflects that from the plaintiffs earliest involvement in the procurement, through contract award, and even at the Performance Management Review, Armour of America could not meet both the weight and ballistics requirements of the Statement of Work using KSP–60. Over a month after the June 10, 2004, contract award, at the July 14, 2004 Performance Management Review, Armour of America briefed the Navy that it was still working with KSP–60, and that KSP–60 could not meet the ballistics requirements. Armour of America President Schreiber's position was that he had a KSP–60 "solution" to the weight requirement, but not for both the weight and ballistics requirements. Instead, Mr. Schreiber apparently believed that after contract award the Navy would relent, relax or ignore the ballistics requirements, and would not enforce them, thereby permitting Armour of America to use its KSP–60 armor material regardless of the KSP–60's capabilities. It became clear to the Navy, and the record so reflects, that although Armour of America had bid on the RFP and had signed the contract, the contractor intended to comply only selectively with the contract's specifications and requirements. Plaintiff's attitude toward the weight and ballistics specifications, that Armour of America could not, and would not, meet the specifications, was a major factor and a justification in the Navy contracting officer's conclusion that plaintiff would not accomplish timely completion of its contract.

Furthermore, rather than comply with the ballistics requirements, Armour of America questioned the requirements, not before but after contract award. In his November 5, 2007 deposition, Mr. Schreiber argued that there was a "contradiction" between the ballistics requirements in the RFP and an unspecified military specification, or MIL–SPEC and, further, that the 2900 fps velocity in the ballistics requirements was a "typo," and inaccurate. The record before the court, however, reflects justification for the 2900 fps, and the court does not find that this was a typographical error. Defendant explains this difference by noting that the MIL–SPEC with 2850 fps also provides for zero degrees of obliquity, whereas the ballistics requirement with 2900 fps provides for 30° of obliquity. In defendant's words: "Because the testing requirement in the RFP specified a 30 degree angle of obliquity, a higher testing muzzle velocity, that is 2900 fps, was required to ensure the same level of ballistic protection as would be demonstrated by testing at zero degree angle of obliquity at a lower muzzle velocity [that is, 2850 fps]." The RFP provides that MIL–PRF–46103E and other MIL–SPECs may be used as a "general guide" in developing a ballistics test plan. Given the differing angle of obliquity between the ballistics requirements (2900 fps) and MIL–PRF–46103E (2850 fps), and the latter describing itself merely as a general guide, the MIL–SPEC provides no justification for ignoring the ballistics requirement of 2900 fps, and supports the defendant's reasonable position that 2900 fps was the velocity Armour of America was required to meet, not ignore, in order to timely complete the contract.

The dialogue between Armour of America and the Navy on the accuracy of the 2900 fps requirement took place after award. Rather than try to clarify the velocity requirement before award, plaintiff, instead, chose to assume that the 2900 fps figure was incorrect, or that the Navy would relax the ballistics requirements after award. Armour of America reviewed, accepted, and executed the contract, but unilaterally ignored the ballistics requirements, and proceeded with its own version of performance. If Armour of America thought there was a major discrepancy or error in the specifications, plaintiff should have brought the matter to the attention of the Navy for resolution prior to contract award or contract execution, as it was required to do. *See Stratos Mobile Networks,*

*USA, LLC v. United States,* 213 F.3d 1375, 1381 (Fed.Cir.2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties. Thus, [plaintiff] 'had a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation.' " (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996))); *see also States Roofing Corp. v. Winter,* 587 F.3d at 1372, 1374. Similarly, Armour of America had a duty to resolve its concerns as to the velocity requirements of the RFP prior to award, but failed to do so. Armour of America's cavalier attitude towards the solicitation and contract requirements, and plaintiff's failure to raise the alleged discrepancy prior to award and to work with the Navy to resolve what it now argues is a major discrepancy in the specifications was an additional factor contributing to the Navy's reasonable concerns about Armour of America's ability to timely complete the contract with the Navy and a reasonable basis supporting the Navy's termination for default of Armour of America's contract.

At the Performance Management Review, over a month after contract award, and in the midst of a five-month development period to design, develop and test armor material, Armour of America acknowledged that its KSP–60 armor would not meet specifications, and that Armour of America would have to start anew, to find and develop a different armor material. The Navy's Program Manager, United States Marine Colonel Bauman, testified that he was "shocked" at Armour of America's false start, and Armour of America's need to start over. Armour of America President Schreiber's recollection was that Colonel Bauman asked him if he could meet the 2900 fps velocity, and that his response was: "Yes, I have worked with silicon carbide. Give me 30 days." From the Performance Management Review on July 14, 2004, to August 25, 2004, the cure notice gave Armour of America 42 days to address the Navy's concerns. Although Armour of America President Schreiber stated at the Performance Management Review that he

would meet the weight and ballistics requirements, Armour of America's need to start over with new armor material was a reasonable part of the Navy's legitimate concerns about Armour of America's ability to timely complete its contract with the Navy. The court finds that this also was a reasonable basis supporting the Navy's termination for default of Armour of America's contract.

Plaintiff abandoned KSP–60 (aluminum oxide), and began working with sintered silicon carbide as the armor material. Independent test results reflected some progress on velocity and weight requirements, from 2527 fps to 2891 fps for velocity, but still short of the velocity requirement of 2900 fps, and 9.87 lbs./sq ft to 7.52 lbs./sq ft for weight, and likewise still short of the weight requirement of 6.79 lbs./sq ft. Armour of America informed the Program Manager, Colonel Bauman, that if they had another four weeks, they "possibly" could meet the weight requirements. Colonel Bauman reported in an August 24, 2004 email to a NAVAIR (Naval Air Systems Command) official that: "AoA stated if they only had a little more time of 4 weeks, they could possibly make the weight. Our collective feeling is that they have been given opportune [sic] time." By August 25, 2004, the date on which Armour of America was to respond to the cure notice and address the Navy's concerns, the plaintiff had not met weight and ballistics requirements with the new material, whereupon, the Navy justifiably issued its notice of the termination of the contract for default on August 26, 2004.

After the termination for default on August 26, 2004, Armour of America, nevertheless, continued testing, in a belated attempt to demonstrate that it could complete the contract on time, or could have successfully completed the contract absent the termination. Armour of America submitted test data for the record that reflected that, even four weeks after the August 26, 2004 default, Armour of America still could meet only the velocity required, but not the weight requirement of 6.79 lbs./sq ft (September 24, 2004 test results: 7.08 lbs./sq ft). In addition, sixty-seven days after the cure notice was issued, on October 5, 2004, Armour of Amer-

ica presented test results which met the velocity required, but not the 6.79 lbs./sq ft weight required (October 5, 2004 test results: 7.05 lbs./sq ft), only 36 days before the QTAs were due to the Navy. Armour of America's need to change armor material and start over was a reasonable part of the Navy's concerns about Armour of America's timely completion of its contract. Moreover, the record before the court demonstrates that plaintiff could not meet the requirements of the contract even 40 days after the termination. The court finds, therefore, that the Navy acted reasonably when it terminated the plaintiff's contract for default.

The Contracting Officer's Determination in support of the default termination noted that boron carbide, a less dense or lighter armor material, was discussed with plaintiff for potential use on the contract, but was not used by Armour of America due to its higher cost. The reprocurement contractor, ArmorWorks, initially, and successfully, used boron carbide for the QTAs (CLIN 0002), but successfully shifted to hot pressed silicon carbide due to the subsequent unavailability of boron carbide. ArmorWorks did not use sintered silicon carbide, which Armour of America was attempting to use to meet the specifications when its contract was terminated.

Defendant retained an expert, Dr. Charles Anderson, Jr., from the Southwest Research Institute, in San Antonio, Texas, a not for profit research institute. At the time he testified, Dr. Anderson was the Director of the Engineering Dynamics Department, in the Mechanical and Materials Engineering Division at the Southwest Research Institute. Dr. Anderson testified that the performance requirements in the contract could be satisfied by state of the art armor materials, which is consistent with ArmorWorks' success in performing the reprocurement contract with boron carbide and hot pressed silicon carbide.

Dr. Anderson, defendant's expert, testified that "not all ceramics are equal. Some ceramics are heavier than other ceramics. Aluminum oxide [Armour of America's KSP–60] ... is relatively inexpensive.... But aluminum oxide has a density of about 3.6. Boron carbide, B4C has a density of 2.5....

[T]he aluminum oxide solution is much heavier than a boron carbide solution, and that much heavier is due to the fact that aluminum oxide just weighs more, has a higher density than boron carbide. So you can decrease the weight of an armor by going to a different ceramic." Dr. Anderson listed the relative costs of ceramic armor material involved in this case, as follows: sintered aluminum oxide (Armour of America's KSP–60)—$10.75/lb.; sintered silicon carbide—$66.00/lb.; hot pressed silicon carbide—$151.00/lb.; hot pressed boron carbide—$260.00/lb. Dr. Anderson also testified that the sintering process involves heating "the ceramic up to about 60 to 80 percent of its melt temperature, and that's what makes it very very hard.... That's the sintering. If instead of just doing heat you apply pressure at the same time as you apply heat, that's called hot press. But now you have an additional cost because you've got to buy the machines to do all the higher pressure. So instead of $66 a pound it goes up to $151 a pound. B4C or boron carbide, because powder is very expensive, processing and everything, it goes up to $260 a pound, so [sic] much more expensive."

After reviewing Armour of America's test data and armor materials, Dr. Anderson testified that Armour of America, using either aluminum oxide (KSP–60) or sintered silicon carbide, would not have been able to meet contract performance requirements. In Dr. Anderson's opinion, Armour of America would have had to shift production to hot pressed silicon carbide or boron carbide, in order to meet contract performance requirements. Dr. Anderson's opinion explains why, as late as October 5, 2004, over a month after the termination for default, Armour of America still had not been able to meet both the weight and velocity requirements of the contract. Dr. Anderson's input, although available for trial, was not available at the time the termination for default was issued on August 26, 2004 by Contracting Officer Woehrer. The Contracting Officer's Determination, however, reflected that other armor materials, such as boron carbide, were suggested to Armour of America, but were rejected by the contractor due to their higher

cost. Armour of America declined to use materials such as boron carbide or hot pressed silicon carbide, but worked instead with heavier, cheaper, armor material, first, KSP-60, an aluminum oxide, then sintered silicon carbide, both of which, according to Dr. Anderson, could not meet contract specifications, no matter how much time Armour of America was afforded. Independent test results confirmed the challenge and failure to meet specifications Armour of America faced in using these heavier, cheaper armor materials. The record contains no independent test results which reflect that both weight and velocity requirements were ever, or could ever, have been met by Armour of America using the heavier armor materials with which it chose to work. Armour of America's poor test performance results and reluctance to use suggested materials actually capable of achieving contract performance requirements was a legitimate basis for concern regarding Armour of America's ability to timely complete its contract with the Navy. The court, therefore, finds that plaintiffs choice of armor materials was a reasonable basis which supported the Navy's conclusion that Armour of America could not complete performance of the contract in a timely fashion and, therefore, was a reasonable basis for the Navy to terminate Armour of America's contract for default.

The Contracting Officer's Determination indicated that the Navy had requested notification of the date and time for the independent testing of the armor fabricated by plaintiff, so that the Navy could witness the testing. The Navy stated, however, that it was not so notified by Armour of America. The Contracting Officer's Determination also noted that the contract required Armour of America to deliver its Qualification Test Plan by July 25, 2004, to ensure testing would meet contract requirements. When the Qualification Test Plan was not timely delivered, the Navy developed the test plan itself and provided it to Armour of America upon learning that plaintiff was shipping armor samples to H.P. White Laboratory for testing. Armour of America's casual approach, failure to facilitate the Navy's presence at the independent testing, although requested by the Navy, and failure to produce a timely Qualification Test Plan, although plaintiff proceeded with testing, was a reasonable part of the Navy's concerns about whether Armour of America could timely meet the contract requirements. The court finds that this was a reasonable basis supporting the Navy's termination for default of Armour of America's contract.

Ms. Woehrer's August 26, 2004, Contracting Officer's Determination to Issue a Termination for Default to Armour of America under Contract N00019–04–C–3147, concluded that:

> AOA has failed to demonstrate any ability to provide an LWARS based upon their proposed enhancements included in the contract [a 41% +/- 5 lbs. weight reduction] or to even meet the Government's minimum program requirements [a 35% weight reduction] and it does not appear likely that additional time will remedy this deficiency. The CH–46E helicopter is currently being used in Iraq by the U.S. Marine Corps to deploy troops and supplies. Iraqi Freedom Funding (IFF) for the LWARS was appropriated by Congress to improve the performance of the CH–46E and the LWARS is essential to the mission of the Fleet. Therefore, the most appropriate course of action is to proceed with award to another vendor. (brackets added).

The *Lisbon* test for the propriety of a default termination "requires the contracting officer's *reasonable* belief that there was no *reasonable* likelihood of timely completion." *McDonnell Douglas XIV,* 567 F.3d at 1348 (citing *Lisbon v. United States,* 828 F.2d at 765) (emphasis in original). The basis for the termination in the present case, reflected in the Contracting Officer's Determination to Issue a Termination for Default to Armour of America Under Contract N00019–04–C–3147, demonstrates the contracting officer's objective and reasonable belief that there was no reasonable likelihood Armour of America could complete its contract on time. The basis for this conclusion, discussed above, included Armour of America's posture, and actions, which demonstrated plaintiffs intention not to meet both weight and ballistics requirements of the contract prior to the

Performance Management Review; Armour of America's decision to wait until after contract award to challenge the Navy's velocity requirements; Armour of America having to start over, with new armor material after the Performance Management Review; Armour of America's failure, even using new armor material, to meet both weight and velocity requirements by the August 25, 2004 date specified in the cure notice (or thereafter as plaintiff continued to test its armor material after the termination for default on August 26, 2004); Armour of America's decision not to work with materials proposed by the Navy which had a better chance of meeting contract specifications; plaintiff's choice to persistently use materials with little or no chance of meeting the specifications; Armour of America's failure to produce a Qualification Test Plan as required by the contract; and Armour of America's failure to facilitate the Navy's presence at an independent testing facility, as requested by the Navy. The Contracting Officer's Determination confirms the defendant's reasonable expectation that the plaintiff would not be able to accomplish timely completion of the contract. The Navy, therefore, was justified in terminating Armour of America for default.

Plaintiff also has not demonstrated, by clear and convincing evidence, that Navy officials, including the contracting officer, acted in bad faith or abused their discretion. The offerors for the LWARS RFP were to demonstrate capability to successfully complete the Statement of Work in accordance with the stated weight and ballistics specifications. Armour of America's proposal to use KSP–60 was not incorporated into the LWARS contract, and did not modify the ballistics and weight requirements in the Statement of Work at issue. The law requires that major discrepancies, such as the incompatibility of the ballistics capabilities of Armour of America's KSP–60 proposal and the ballistics requirements in the Statement of Work, be raised and clarified by plaintiff prior to contract signing. *States Roofing Corp. v. Winter*, 587 F.3d at 1364. Armour of America chose not to clarify, but to ignore explicit

ballistics requirements in the contract, and to assume that the requirements would be relaxed or modified to meet plaintiff's desired approach to performance. Such a posture strikes at the heart of the procurement process, for all offerors must compete to the same Statement of Work. Under Armour of America's reasoning, the other offerors were competing to the standards in the RFP and contract Statement of Work, but after winning the contract, plaintiff should not necessarily have been held to those standards during performance. The Navy acted reasonably to enforce the ballistics and weight requirements in the contract in order to obtain the solicited product and to ensure that all offerors were offered an equally fair opportunity to compete in accordance with the RFP. In sum, plaintiff has not carried its burden to demonstrate bad faith or improper termination for default on the part of the agency. Based on the evidence in the record, there was a reasonable basis supporting the Navy's conclusion that Armour of America would not, and could not, perform the contract in a timely manner. The termination for default of Armour of America's contract, therefore, was justifiable.

*Acceleration of Contract Requirements*

Plaintiff further argues that the Navy's cure notice effected an unjustified acceleration of the terms of the contract and delivery of the QTAs. The Navy's July 30, 2004 cure notice stated that, by August 25, 2004, Armour of America must demonstrate, with independent test results, that it could meet the 2900 fps velocity requirement and the 6.79 lbs./sq ft weight requirement. Plaintiff argues that in order to meet the weight and ballistics requirements, test panels needed to be tested, and that, had those test panels met the requirements during testing, Armour of America could have produced the CLIN 0002 QTAs within about 10 days. In plaintiff's words:

> AOA could not submit test reports meeting weight and ballistics on August 24th[, 2004][19] without a completed test panel. AOA could not meet the Cure Notice un-

19. August 25, 2004 is the date by which the government directed Armour of America to cure the conditions which the government had determined were endangering timely contract performance in accordance with contract specifications.

less they produced tests showing that a panel met the weight and ballistic requirements of the contract. A satisfactory test panel was 90% of the deliverable on November 10th[, 2004]. If AOA provided a passing test report as required by the Cure Notice, AOA would have been 90% complete meeting the contractual requirements for a deliverable on November 10th[,2004]. Once AOA has a working test panel, AOA would have completed two complete ship sets within 10 days.

The Cure Notice accelerated the contract of the deliverable [the Qualification Test Sets] of November 10, 2004 to August 24, 2004. The Cure Notice required a test from an independent test lab that proved that the two test panels that were to be delivered November 10th[, 2004] passed all the contractual requirements including the weight and ballistics. The Government argument states that the Cure Notice did not accelerate the contract because nothing was "deliverable" on August 24th[, 2004] except all the qualifying test reports to prove that AOA had a panel that met all the contractual requirements. The Government's argument states that we didn't need a panel that met all the contractual requirements of the contract, only a test report stating that we met all the contractual test requirements. The Government states they were only interested in the test reports and did not need a panel that met all contractual requirements. If AOA completed a test report on August 24th[, 2004] then they would have been able to deliver the two panels and all the shipsets [sic] complete [sic] by September 4th[, 2004] (10 days later) which is two month [sic] earlier than required by contract. AOA only needed ten days to complete the shipsets [sic] after the completed tests. There is no doubt that the Cure Notice accelerated material contract requirements of Nov 10th 2004. (brackets added).

The cure notice stated that, "[f]ailure to meet these requirements in terms of schedule or ability to meet the minimum contract requirements may result in a termination for Default." The basis for plaintiffs termination for default was detailed in the August 26, 2004, Contracting Officer's Determination to Issue a Termination for Default to Armour of America Under Contract N00019–04–C–3147, addressed above. The failure to achieve or make acceptable progress in achieving the weight and ballistics requirements with regard to the cure notice was an important part of, but not the only basis, for the default termination. As discussed above, the default termination also was founded on Armour of America's stated intention not to meet both the weight and ballistics requirements it contracted to meet, Armour of America's failure to show through testing the reasonable likelihood that plaintiff would ever meet both weight and ballistics requirements given the heavy armor materials with which Armour of America insisted on working, and plaintiff's attitude, as reflected not only in its intention to ignore contract requirements, but also in its failure to produce a Qualification Test Plan on its own and its refusal to facilitate the presence of Navy personnel during live armor testing at an independent test facility. What plaintiff characterizes as "acceleration" is no more than the Navy taking responsible action, in this case in direct support of soldiers in the field, to attempt to ensure timely and full completion of Armour of America's contract.

Defendant argues that the cure notice did not change the November 10, 2004 delivery date of the two QTAs, as stated in the contract between the Navy and Armour of America and, therefore, the contract was not accelerated. The base contract consisted of CLINs 0001 through 0004. CLIN 0001 was for LWARS Non–Recurring Engineering, CLIN 0002 was for two sets of QTAs, to be delivered to the Navy by November 10, 2004, CLIN 0003 was for data for the first two CLINs, and CLIN 0004 was for travel in support of the first two CLINs.

According to the defendant, plaintiff's own actions generated the Navy's cure notice. The cure notice was issued on July 30, 2004 after the July 14, 2004, disquieting Performance Management Review, in which Armour of America questioned the accuracy of the 2900 fps velocity requirement, briefed the Navy that it had never intended to meet both the weight and ballistics requirements of the contract and confirmed that testing to date

using KSP–60 did not meet those requirements. Shortly after the Performance Management Review, on July 19, 2004, Armour of America acknowledged that an armor test, "did not go as well as expected." The cure notice followed on July 30, 2004. The focus of the concerns, identified by the Navy, which led to the cure notice, included whether Armour of America could meet the weight and velocity requirements of the Statement of Work. As discussed above, it was logical and reasonable that the interim failures and lack of intention to meet both the weight and ballistics requirements of the contract on the part of the contractor would be the subject of the cure notice. Once given a cure notice, Armour of America could have alleviated the Navy's concerns as to timely contract completion, but plaintiff did not alleviate the Navy's weight and ballistics concerns, which remained, leading to the termination for default. Under Armour of America's theory, that the Navy should not have asked Armour of America, through the cure notice, to demonstrate that it could meet both the weight and velocity requirements of the Statement of Work, plaintiff attempts to effectively remove the Default clause from the contract, and in particular the language of the Default clause which states, if the contractor fails to make progress, so as to endanger performance of the contract, the contract may be terminated for default, so long as the contractor was afforded an opportunity to cure. *See* 48 C.F.R. § 52.249–8(a)(1)(ii), (a)(2). In fact, even after the cure notice, plaintiff still was unable or unwilling to reassure the government that both ballistics and weight requirements of the Statement of Work would be met.

To prove a constructive acceleration claim, and entitlement to an equitable adjustment, which Armour did not attempt to do during the proceedings before the court, a contractor must show (1) that the contractor encountered a delay that was excusable; (2) that the contractor requested from the government an extension of time due to the delay; (3) that the government denied the contractor's request for an extension of time; (4) that the government demanded completion of the contract in a shorter amount of time than the contractor was entitled to,

given the excusable delay; and (5) that the contractor was required to expend additional resources to adhere to the schedule on which the government insisted. *See Fraser Constr. Co. v. United States*, 384 F.3d 1354, 1361 (Fed.Cir.2004); *see also Edge Constr. Co., Inc. v. United States*, 95 Fed.Cl. 407, 421 (2010).

In *Consolidated Construction, Inc.*, an ASBCA case, a cure notice was issued by the agency when the contractor was "seriously behind schedule from the outset of performance." *Appeal of Consol. Constr., Inc.*, ASBCA 46498, 99–1 BCA ¶ 30148, at 149,158 (1998), *aff'd*, 230 F.3d 1378 (Fed.Cir.2000) (table). The Board in *Consolidated Construction* noted that, "exhortations by Government officials for appellant to get its progress back on track would have been justified." The court concluded that the cure notice did not constitute an acceleration of work, and denied the contractor's acceleration claim. *Id.*; *see also* John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, *Administration of Government Contracts* 451 (4th ed. 2006) ("Furthermore, issuing a cure notice when a contractor is behind schedule, mainly due to its own difficulties, is not the type of threat to default that will be construed as an acceleration order." (citing *Consolidated Construction, Inc.*)).

In the present case, Armour of America did not file a constructive acceleration claim for an equitable adjustment, but in response to the default termination, argues that since the QTAs were not due until November 10, 2004, it was improper for the Navy to demand, in the cure notice, that Armour of America demonstrate it could meet weight and ballistics requirements prior to that point in time. The court finds, however, that the issuance of the cure notice itself was reasonable, in that the Navy had legitimate and reasonable concerns about Armour of America's ability to meet the Statement of Work specifications and effect timely completion of the contract. After Armour of America was afforded the opportunity to cure, the Navy had continuing concerns about plaintiff's ability to meet weight and velocity requirements in a timely fashion. These concerns were reasonable given Armour of

America's lack of progress, choice of materials and progress to date. The Navy's termination of the contract for default was reasonable and not accelerated.

*Commercial Impracticability*

Plaintiff also argues that "the additional $1.5 million to successfully complete the original $6 million contact was unreasonable and commercially impracticable." Plaintiff contemplated using a less expensive material, KSP–60, an aluminum oxide, to perform the contract, but the Navy informed Armour of America at the July 14, 2004 Performance Management Review that the weight and ballistics requirements of the Statement of Work would not be relaxed, so plaintiff began using a somewhat more expensive sintered silicon carbide in an attempt to meet the contract requirements. After the termination for default, reprocurement contractor ArmorWorks completed the contract with boron carbide and hot pressed silicon carbide. Since KSP–60 could not meet the weight and ballistics requirements, and the Navy insisted on compliance with the Statement of Work, Armour of America argues that "performance of the contract could not be accomplished without commercially unacceptable costs and time beyond that contemplated in the contract."

In support, plaintiff cites *Foster Wheeler Corp. v. United States*, 206 Ct.Cl. 533, 513 F.2d 588 (1975). In *Foster Wheeler*, the United States Court of Claims stated that, "'impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.'" *Foster Wheeler Corp. v. United States*, 206 Ct.Cl. at 544–45, 513 F.2d at 594 (quoting *Restatement of the Law, Contracts* § 454). *Foster Wheeler*, however, is distinguishable from the present case. In *Foster Wheeler*, government specifications to build two boilers were in conflict between "shock-hard" requirements and maintenance requirements. *Id.* at 538–39, 513 F.2d at 590–91. The Court of Claims found that the government's specifications did not call for a state of the art effort, but a developmental effort, that claimant could not meet the specifications, nor could any other contractor, and that the government subsequently changed

its impossible specifications. *Id.* at 545–47, 513 F.2d at 594–96. In contrast, based on the record before the court, the Navy's armor contract specifications were within the state of the art, the Navy did not substantially change its basic requirements, and those requirements actually were met by Armor-Works in the reprocurement contract. Defendant also correctly points out that Armour of America did not explicitly raise a commercial impracticability defense in its amended complaint or response to the defendant's counterclaim for reprocurement costs, and did not provide testimonial or documentary evidence which would support a finding that it would have been commercially impractical to be required to use a state of the art armor material capable of meeting the weight and ballistics specifications of the contract.

The Default clause in Armour of America's contract states that "the Contractor shall not be liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the Contractor." 48 C.F.R. § 52.249–8(c); *see also Massachusetts Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1374 (Fed.Cir.2001) ("Where, at the time a contract is made, a party's performance under it is impracticable *without his fault because of a fact of which he has no reason to know* and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary." (quoting *Restatement (Second) of Contracts* § 266(1) (1981)) (emphasis in original)).

Armour of America cannot meet the "beyond the control and without the fault or negligence of the Contractor" test of the Default clause in its contract. Armour of America believed there to be a discrepancy in the 2900 fps velocity requirement, before award, but did not bring the perceived discrepancy to the attention of the Navy until after award. Armour of America was well aware of the weight and ballistics requirements in the RFP and the contract, but had no intention of meeting those requirements. Armour of America intended to use KSP–60, an armor material which could not meet the

requirements of the contract, and based on the evidence in the record, after award its apparent plan was for the Navy to relax the weight and/or ballistics requirements. No other contractor was able to bid to relaxed specifications, but Armour of America went forward with a plan that could only succeed if the Navy relaxed the specifications after award. Thus, the situation Armour of America found itself in, of having to use a superior, more expensive armor material, if the contract specifications were to be met, was of its own making, was not beyond its control, or without its own fault or negligence.

Moreover, generally, considerably greater costs than are accounted for in the present case would render a contract commercially impractical to perform:

The basic test is whether the costs of performing the work are so much greater than anticipated as to render performance commercially senseless. In [*Appeal of*] *Ocean Salvage, Inc.,* ENGBCA 3485, BCA ¶ 11,905 [ (1976) ], practical impossibility occurred when a 800–ton crane costing more than double the contract price was required to remove a sunken barge that the parties had assumed could be removed by only a 5–ton crane. The board reasoned that this new undertaking was "wholly beyond the control and ability of the [contractor] to perform."... See also *SMC Info. Sys., Inc. v. General Servs. Admin.,* GSBCA 9371, 93–1 BCA ¶ 25,485, finding impracticability when the contractor expended more than four times the contract price attempting to accomplish the work, but refusing to grant relief because the contractor had not given the government notice of its difficulties.

John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, *Administration of Government Contracts* 320 (4th ed. 2006). In the present case, Armour of America could have been faced with an additional $1,507,438.00 on a potential $6,038,958.00 million contract, which generally would not be considered a figure which renders a procurement commercially senseless. Armour of America's own figures, contained in its certified claim to the Navy, reflected that Armour of America expected to make a profit of $2,180,000.00 on its

contract with the Navy. Had Armour of America used hot pressed silicon carbide, and thereby incurred up to an additional $1.5 million in costs, as reprocurement contractor ArmorWorks did using boron carbide and hot pressed silicon carbide, Armour of America would have been within its bid, and still theoretically would have realized some profit, albeit smaller than anticipated. The court finds that Armour of America's performance of the contract to meet contract specifications was not commercially impracticable.

*Reprocurement Costs*

Defendant seeks excess reprocurement costs in the amount of $1,507,438.00 from plaintiff resulting from the difference in price of the reprocurement contract and plaintiff's defaulted contract. Defendant also seeks $45,630.00 in administrative costs resulting from the reprocurement.

When asserting a counterclaim, the government "bears the initial burden of demonstrating that it acted reasonably and in accordance with the procedures set out in the contract for calculating damages." *Seaboard Lumber Co. v. United States,* 48 Fed.Cl. 814, 819 (2001), *aff'd,* 308 F.3d 1283 (Fed.Cir. 2002). " 'Whether the contracting officer acted reasonably, under the circumstances of a particular reprocurement, is a question of fact.' " *Lassiter v. United States,* 60 Fed.Cl. 265, 270 (2004) (quoting *Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 484 (1993)). Damages are measured by the difference between the reasonable reprocurement price and the defaulted contract price. *See Cascade Pac. Int'l v. United States,* 773 F.2d 287, 293 (Fed.Cir.1985) (citing *Marley v. United States,* 191 Ct.Cl. 205, 423 F.2d 324, 333 (1970); *Rumley v. United States,* 152 Ct.Cl. 166, 285 F.2d 773, 777 (1961); and J. Calimari and J. Perillo, *Contracts* 547 (2d ed. 1977)). "[E]xcess reprocurement costs may be imposed only when the Government meets its burden of persuasion that the following conditions (factual determinations) are met: (1) the reprocured supplies are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs resulting from the default." *Cascade Pac. Int'l*

*v. United States,* 773 F.2d at 293–94 (citing 41 C.F.R. § 1–8.602–6(a), FPR 1–8.602–6(a); *Astro–Space Labs., Inc. v. United States,* 200 Ct.Cl. 282, 470 F.2d 1003, 1018 (1972); *Appeal of Envt'l. Tectonics Corp.,* ASBCA No. 21204, 78–1 BCA ¶ 12,986, 1978 WL 2061 (1978); and *Appeal of Solar Labs., Inc.,* ASBCA 19957, 76–2 BCA ¶ 12,115, 1976 WL 1945 (1976)); *see also Lassiter v. United States,* 60 Fed.Cl. at 270. If the government sustains its burden, the burden then shifts to the plaintiff for rebuttal. *See Seaboard Lumber Co. v. United States,* 308 F.3d at 1300–01 ("Thus, in this circuit [the Federal Circuit], where a contractor's breach results in the necessity for reprocurement of substantially similar goods or services, the burden of proving the effects of changes in the reprocurement contract terms on the contract price is properly placed on the breaching contractor.").

For the first prong of the test for reprocurement costs, that "the reprocured supplies are the same or similar to those involved in the termination," we must compare "the item reprocured with the item specified in the original contract." *Cascade Pac. Int'l v. United States,* 773 F.2d at 294 (concluding that reprocured spring hinges were the same as or similar to defaulted spring hinges because the former "were plated and otherwise met the requirements of the specifications" of the defaulted contract) (citing *Envtl. Tectonics Corp.,* 78–1 BCA ¶ 12,986, at 63,308); *see also* 48 C.F.R. § 49.402–6(a), Repurchase Against Contractor's Account (2003) ("When the supplies or services are still required after termination, the contracting officer shall repurchase the same or similar supplies or services against the contractor's account as soon as practicable."). "The word 'similar' as used in the Default clause means similar in physical and mechanical characteristics as well as functional purpose." *Envtl. Tectonics Corp.,* 78–1 BCA ¶ 12,986, at 63,309 (discussing a default clause similar to the one in the instant case) (citing *Appeal of Arjay Mach. Co., Inc.,* ASBCA No. 16535, 73–2 BCA ¶ 10,-179, 1973 WL 1886 (1973); *Appeal of Marmac Indus., Inc.,* ASBCA No. 12158, 72–1 BCA ¶ 9249, at 42,888, 1971 WL 1396 (1971); and *Lome Elecs., Inc.,* ASBCA Nos. 8642,

8707, 1963 BCA ¶ 3833, 1963 WL 1148 (1963)).

The reprocurement test also has been articulated by the United States Supreme Court in *United States v. Axman,* 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914), as:

> whether the contract relet for the completion of the work under paragraph 4 of the original contract was a contract for work for which Axman was bound and which he had failed to carry out, or whether it was a different contract, and therefore one for which Axman and his surety cannot be held, and which cannot be used for the measure of recovery for breach of the original contract.

*United States v. Axman,* 234 U.S. at 42–43, 34 S.Ct. 736. In *Axman,* the Supreme Court found that the work done under the reprocurement contract, "was not the work which the first contractor had agreed to perform," and "in a material manner was different from the contract first entered upon." *Id.,* at 45, 34 S.Ct. 736.

The United States Court of Appeals for the Federal Circuit, in *Seaboard Lumber Company,* stated that:

> The cases in which the courts have barred a damage claim under *Axman* involved substantial and material changes in the physical nature of the performance, i.e., the work to be performed or the goods to be delivered, from the original contract to the re-let contract. *Consol. Airborne Sys., Inc. v. United States,* 172 Ct.Cl. 588, 348 F.2d 941, 947 (1965); [*United States v.*] *Cal. Bridge* [*and Constr. Co.*], 245 U.S. [337,] 344–45, 38 S.Ct. 91, [62 L.Ed. 332 (1917) ] (holding original contractor not liable for additional cost of re-let contract where significant changes were made to the construction specifications); *Schwartz* [*v. United States*], [106 Ct.Cl. 225, 237–38,] 65 F.Supp. [391,] 393 [ (1946) ] (holding that the government could not charge contractor excess cost of re-let contract where the re-let contract was for a more expensive communication system based on different technology than that provided under the original contract); *Rosenberg v. United States,* 76 Ct.Cl. 662, 677–79 (1933) (holding that the government could not charge

contractor excess cost of re-let contract where the government's specifications were impossible to meet, government changed the specifications but did not change the price to be paid, original contractor refused to perform, and new contractor was paid more to meet new specifications); *George Leary Constr. Co. v. United States,* 63 Ct.Cl. 206, 225–26 (1927) (holding that the government could not charge contractor excess cost of re-let contract where government caused a delay in contract performance in which contractor was to use his own equipment, original contractor's costs increased, and government refused to allow original contractor to perform at cost, but allowed new contractor to use government equipment, and paid new contractor a different rate).

*Seaboard Lumber Co. v. United States,* 308 F.3d at 1298. "Similarity," however, does not require that the reprocured item be identical to the original contract specifications. *See Associated Traders, Inc. v. United States,* 144 Ct.Cl. 744, 751, 169 F.Supp. 502, 506 (1959) (finding that adhesive sought under the reprocurement contract met the specifications of the original contract).

▮▮▮ Therefore, "[u]nder the FAR the Government is not entitled to costs arising from 'material changes' in the reprocurement specifications that result in 'substantial alterations' in the work." *CJP Contractors v. United States,* 45 Fed.Cl. 343, 385–86 (1999) (quoting *United States v. Axman,* 234 U.S. 36, 34 S.Ct. 736, and citing *Cascade Pac. Int'l v. United States,* 773 F.2d at 293–94). "Substantial and material differences in the physical characteristics of supplies repurchased, as contrasted with those specified in a defaulted contract, have been repeatedly held to be such a material deviation as to render the defaulting contractor not liable in accordance with contract terms for excess costs incurred in the repurchase of allegedly 'similar' supplies." *Consol. Airborne Sys., Inc. v. United States,* 172 Ct.Cl. 588, 599–600, 348 F.2d 941, 947 (1965). In contrast, "minor variations or deviations in the repurchase contract do not relieve the defaulted contractor of his liability for excess costs." *Envtl. Tectonics Corp.,* 78–1 BCA ¶ 12,986, at 63,309 (citing *H.N. Bailey & Assocs. v. United States,* 196 Ct.Cl.

166, 449 F.2d 376 (1971) and *Appeal of Skiatron Elecs. & Television Corp.,* ASBCA No. 9513, 65–2 BCA ¶ 5053, 1965 WL 403 (1965)); *see also Indus. Design Labs. v. United States,* No. 367–78, 29 Cont. Cas. Fed. (CCH) ¶ 81,904, 1981 WL 30803, at *6 (Ct.Cl.1981) (upholding an ASBCA decision that items were similar because the same contract drawing was applicable and there were no material differences in the overall quality assurance provisions, in addition to which, there was no evidence indicating that the non-material differences resulted in a price change to what the reprocurement contractor would otherwise have bid). Furthermore, changes to the reprocurement contract from the original contract correcting a minor omission do not necessarily render the contracts dissimilar. *See Envtl. Tectonics Corp.,* 78–1 BCA ¶ 12,986, at 63,309. Indeed, the Default clause gives the contracting officer wide discretion in choosing which items to reprocure, and changes to the reprocurement contract may be within the "variation or deviation of contract terms within the contemplation of the parties in the broad grant of discretion to the contracting officer under the language of the Default article." *Consol. Airborne Sys., Inc. v. United States,* 172 Ct.Cl. at 601, 348 F.2d at 948.

The second prong of the test for reprocurement costs requires the government to show that it actually incurred costs and "what it spent in reprocurement." *Cascade Pac. Int'l v. United States,* 773 F.2d at 294 (citing *Fairfield Scientific Corp. v. United States,* 222 Ct.Cl. 167, 611 F.2d 854, 863–66 (1979)); *see also* 48 C.F.R. § 49.402–6(c), Repurchase Against Contractor's Account (2003) ("If repurchase is made at a price over the price of the supplies or services terminated, the contracting officer shall, after completion and final payment of the repurchase contract, make a written demand on the contractor for the total amount of the excess, giving consideration to any increases or decreases in other costs such as transportation, discounts, etc.").

▮▮▮ In calculating excess reprocurement costs, "[t]he measure of the Government's damage is the difference between what it

cost it to do the work and what it would have cost it to do the work had the appellant not been terminated for default." *Appeal of Romeo P. Yusi & Co.*, ASBCA No. 19810, 76–1 BCA ¶ 11835, at 56,595 (1976); *see also Gen. Dynamics Corp. v. United States*, 229 Ct.Cl. 399, 410, 412, 671 F.2d 474, 480, 481 (1982) (concluding that if a plaintiff breached its contract, the government is entitled to the costs of reprocurement which exceeded the amount for which the plaintiff was obligated to perform); *Consol. Airborne Sys., Inc. v. United States*, 172 Ct.Cl. at 602, 348 F.2d at 949 (calculating excess reprocurement costs based on what it would have cost plaintiff to fulfill its defaulted contract); *Appeals of Spectrum Gov't Healthcare Servs.*, ASBCA Nos. 48149, et al., 96–2 BCA ¶ 28526, at 142,455–142,456 (1996). Excess reprocurement costs can include the price of an optional item or service which was incorporated in both the reprocurement and original defaulted contract, but which was exercised only under the reprocurement contract. *Am. Elec. Labs., Inc. v. United States*, No. 101–78, 26 Cont. Cas. Fed. (CCH) ¶ 83,393, 1979 WL 16465, at *1, *4, *10 (Ct.Cl. Trial Div. 1979) (upholding an ASBCA decision awarding excess reprocurement costs which included the cost of an option that was included in both the defaulted and reprocurement contracts, but which was exercised only under the reprocurement contract), *aff'd*, 222 Ct.Cl. 653, 650 F.2d 285 (1980) (table).

The third prong of the test to reclaim reprocurement costs "requires that the Government act within a reasonable time of the default, use the most efficient method of reprocurement, obtain a reasonable price, and mitigate its losses." *Cascade Pac. Int'l v. United States*, 773 F.2d at 294 (citing *Astro–Space Labs., Inc.*, 200 Ct.Cl. 282, 470 F.2d at 1018; *Envtl. Tectonics Corp.*, 78–1 BCA ¶ 12,986; and *Solar Labs., Inc.*, 76–2 BCA ¶ 12,115) (footnote omitted). 48 C.F.R. § 49.402–6(a), (b), Repurchase Against Contractor's Account (2003), provides that after a defaulted contract, if the contracting officer chooses to reprocure it must be done "as soon as practicable. The contracting officer shall repurchase at as reasonable a price as practicable, considering the quality and delivery requirements.... [T]he Default clause

authorizes the contracting officer to use any terms and acquisition method deemed appropriate for the repurchase. However, the contracting officer shall obtain competition to the maximum extent practicable for the repurchase." 48 C.F.R. § 49.402–6(a), (b). "[R]easonable time depends on the facts and circumstances that exist in a particular situation, but the test is usually whether the contractor was charged a higher price due to the passage of time. Moreover, a contractor who alleges that it has been prejudiced by a contracting officer's delay has the burden of proof and the contractor must not have contributed to the delay." *Astro–Space Labs. Inc. v. United States*, 200 Ct.Cl. at 308, 470 F.2d at 1018 (finding that awarding the reprocurement within thirty-three days after the termination was reasonable). As indicated above, whether the contracting officer acted reasonably is dependent on the particular facts of the case under review. *See Lassiter v. United States*, 60 Fed.Cl. at 270. "In assessing whether reprocurement costs are reasonable the court may consider whether there was a lack of negotiation or price analysis or a lack of adequate competition." *CJP Contractors v. United States*, 45 Fed.Cl. at 384 (citing *Appeal of Wise Instrumentation & Control, Inc.*, NASA BCA Nos. 673–7, 1072–12, 75–2 BCA ¶ 11,478, 1975 WL 1969, *recons. denied*, 76–1 BCA ¶ 11641 (1975)). "Furthermore, '[t]he abbreviated nature of the procurement process, as well as the limited duration of the emergency service contract can justify a higher price for the service than a contract for a longer duration that is obtained through the normal procurement process.'" *Lassiter v. United States*, 60 Fed.Cl. at 271 (quoting *Appeal of M.D.R.–RIC*, PSBCA No. 4472, 2001–1 BCA ¶ 31,302, 2001 WL 185509 (2001)).

Depending on the circumstances of the case, the price of reprocurement may be adjusted downward to account for improvement of the reprocured product. *See Ubique Ltd. v. United States*, No. 377–77, 27 Cont. Cas. Fed. (CCH) ¶ 80,147, 1980 WL 20807 at *2–5 (Ct.Cl. Trial Div.1980). Similarly, when a reprocurement contract calls for a reduced number of the procured items, which increases the per unit price in a manner in which

the per unit price increase can be determined, the defaulting contractor will be entitled to a reduction in the excess costs owed the defendant for the increase caused by the reduced quantity solicited. *Consol. Airborne Sys., Inc. v. United States,* 172 Ct.Cl. at 602, 348 F.2d at 949.

In sum, the facts of the individual case control, and "[t]he duty to mitigate excess costs ... is one of acting reasonably under the circumstances." *Envtl. Tectonics Corp.,* 78–1 BCA ¶ 12,986, at 63,309; *see also Marley v. United States,* 191 Ct.Cl. at 221, 423 F.2d at 333 (concluding that "[t]he award is therefore conditioned upon proof of a reprocurement action reasonably designed to minimize the excess costs."); *Consol. Airborne Sys., Inc. v. United States,* 172 Ct.Cl. at 599, 348 F.2d at 947 (finding the government's contracting officer to have acted reasonably as to the reprocurement mechanism, the timing of the reprocurement, and the quantity and price of the electronic equipment reprocured); *CJP Contractors v. United States,* 45 Fed.Cl. at 384 (finding the reprocurement process to be unreasonable because the contractor failed to conduct a competition, negotiate a price, or prepare a price analysis).

Defendant contends that the reprocured items are the same as, or similar to, the items specified in the original defaulted contract because the "Navy sought to procure under both plaintiffs contract and ArmorWorks' contract lightweight armor which met certain ballistic specifications." Plaintiff, however, disagrees and argues that the reprocured items are not the same as or similar to the specifications in its contract. First, according to Armour of America, its contract included the requirement of two QTAs, but ArmorWorks' contract did not include these articles. Furthermore, Armour of America argues that it was required to submit a test panel that would withstand three shots, including at the edges. In contrast, ArmorWorks' test panel was required to withstand one shot, and its panel was smaller than the one required of Armour of America. Plaintiff further contends that the

change in the size of the panels and in the multi-hit requirement necessitated stronger armor from plaintiff, Armour of America, than from reprocurement contractor, Armor-Works. Moreover, Armour of America's and ArmorWorks' contracts had different weight requirements, and Armour of America's contract was not modified to include time extensions, unlike ArmorWorks' contract. Additionally, plaintiff asserts that its contract was only for CLINs 0001–0002, while Armor-Works' contract included several options, and that Armour of America's contract did not include non-recurring engineering costs, unlike ArmorWorks' contract. Finally, plaintiff argues that Armour of America's contract did not require use of boron carbide, as did ArmorWorks' contract, although silicon carbide was ultimately used by ArmorWorks.

The test to measure reprocurement damages requires a comparison of the specifications of the original contract items and the items in the reprocurement contract. The issue is whether the contracts were dissimilar and, if so, whether the dissimilarities were substantial and material. *See United States v. Axman,* 234 U.S. at 42–43, 45, 34 S.Ct. 736; *Cascade Pac. Int'l v. United States,* 773 F.2d at 293–94; *CJP Contractors v. United States,* 45 Fed.Cl. at 385–86. Certain of the dissimilarities between plaintiff's and the reprocurement contractor's contracts are the result of different enhancements proposed by both plaintiff and ArmorWorks to the RFP, which the Navy incorporated into plaintiff's and ArmorWorks' respective contracts.[20] Plaintiff contends that Armor-Works did not contract to provide QTAs as plaintiff did. Plaintiff is incorrect. In the "Supplies or Services and Prices" section of Armour of America's contract, CLIN 0002 is listed as "Qualification Test Articles." Although ArmorWorks' contract originally listed CLIN 0002 as "LWARS Non–Recurring Engineering," Modification 1 of the Armor-Works' contract changed the name to "Qualification Test Articles." Furthermore, both contracts specify the same quantity, two units, in CLIN 0002 and the prices are relatively similar ($34,907.00 per unit for Armour

---

**20.** The Navy did not issue a second RFP for the reprocurement, but reconvened the Source Selection Evaluation Board to reconsider updated proposals submitted by the offerors to the original RFP.

of America's contract versus $42,500.00 per unit for ArmorWorks). In addition, the "Description and Specifications" section of both contracts contains the same description for CLIN 0002, and titles the item as "Qualification Test Articles (CLIN 0002)."

Plaintiff likewise is incorrect that Armour of America's contract was only for CLINs 0001–0002. Plaintiff's base contract was for CLINs 0001–0004, but plaintiff also contracted to provide all optional CLINs listed in the contract's "Supplies or Services and Prices" section, upon the government's written request. Moreover, the fact that ArmorWorks' contract included non-recurring engineering costs, which Armour of America's contract did not include, does not render the items procured so dissimilar as to result in substantial changes to the work involved. In fact, CLIN 0001, titled "LWARS Non–Recurring Engineering," was included in both contracts; Armour of America simply did not charge for it. Furthermore, that Armor-Works had to conduct some development of the QTAs and charge non-recurring engineering costs does not indicate that Armor-Works' contract called for a substantial and material deviation of the QTA specifications themselves.

The weight requirement in Armour of America's contract and ArmorWorks' contract diverge somewhat. Both the RFP and plaintiff's contract stated that the total weight of the existing metallic armor system, which was to be reduced by Armour of America, was 577 pounds. In contrast, ArmorWorks' reprocurement contract stated that the total weight of the metallic armor to be reduced was 497 pounds. The parties' explanation for this 80 pound discrepancy is that the Navy failed to subtract from the RFP and from Armour of America's contract the 80 pound weight of the interior pylon armor, which was not to be replaced by the LWARS armor, but removed from the sys-

tem. The Navy recognized the mistake in the RFP and in Armour of America's contract, and corrected it before the award of the reprocurement contract to ArmorWorks. The correct starting weight of the armor to be reduced was 497 pounds. With respect to this discrepancy, the parties have agreed that: "This discrepancy had no effect on either AOA or ArmorWorks [sic] ability to meet the contract requirements because weight reduction was measured in terms of areal density, that is, pounds per square inch, and not in terms of the reduction in the gross weight of the armor."

In the RFP, the minimum weight reduction required was a 35% reduction in areal density over the existing metallic armor system. Plaintiff's contract provided that the minimum weight reduction required was 41% +/- 5 lbs.[21] ArmorWorks' contract provided that the armor system shall weigh no more that 268 lbs. The parties have explained that this 268 lb. figure represented another error, which subsequently was corrected in Modification 3 of the ArmorWorks contract. Modification 3 stated that the armor system shall weigh no more than 303 lbs., reflecting a 298 lb. maximum weight (instead of the 268 lbs.), +/- 5 lbs., which meant that the armor system could not weigh more than 298 lbs., + 5 lbs., or 303 lbs. total, under ArmorWorks' contract. Although the figure for the percentage reduction in weight was not given in the Armor-Works contract, the percentage is computed as 40%.[22] Thus, the reduction in weight of the armor system was 35% in the RFP, 41% (+/- 5 lbs.) in Armour of America's contract, and 40% (+/- 5 lbs.) in Armor-Works' contract. The maximum weight of the armor systems in Armour of America's and ArmorWorks' contracts, calculated as a percentage of weight reduction therefore, are relatively similar. Correcting the 80 lb. error in the existing weight of the armor system in Armour of America's contract,

---

**21.** The parties explain that the "+/- 5 pounds" was included in both Armour of America's and ArmorWorks' weight reduction figures, "to account for process and material variations."

**22.** The figure of 40% is derived as follows: 497 lbs. existing armor weight - 298 lbs. maximum weight after reduction = a 199 lb. reduction;

then 199/497 = 40%. Therefore, for Armor-Works contract, the 40% reduction in weight, +/- 5 lbs., is 298 lbs. + 5 lbs. = 303 lb. maximum weight of the LWARS armor after the reduction in weight. The parties have stipulated to this 40%, + 5 lbs., figure of 303 lbs., for the ArmorWorks contract.

from 577 lbs. to 497 lbs., and applying the 41% reduction figure proposed by Armour of America and accepted by the Navy, yields armor which could weigh no more than 293 lbs., + 5 lbs., or a maximum weight of 298 lbs. Applying the 40% reduction figure, proposed by ArmorWorks and accepted by the Navy, yields armor which could weigh no more that 298 lbs., + 5 lbs., or a maximum of 303 lbs. Comparing the 5 lb. difference between Armour of America's maximum 298 lb. armor, and ArmorWorks' maximum 303 lb. armor, the court concludes that the reprocured armor system, from a weight reduction standpoint, was similar, and not substantially or materially changed, from the armor system required of Armour of America. *See Seaboard Lumber Co. v. United States,* 308 F.3d at 1298 (citing cases in which courts have barred reprocurement claims asserted against the original contractors involving "substantial and material changes in the physical nature of the performance."). Moreover, the reprocurement contract was not identical to the original contract in the present case, with respect to the weight reduction of the armor system, due to both Armour of America and ArmorWorks proposing their own, individual enhancements to the 35% weight reduction contained in the RFP to which both contractors were responding.[23] Finally, plaintiff has not demonstrated that reprocurement costs which defendant seeks from plaintiff should be reduced by any amount due to the relatively small variance in the weight reduction, comparing what was required of Armour of America to what was subsequently reprocured from ArmorWorks.

The Navy's ballistics requirements also differed somewhat between the two contracts. Both contracts required the armor to withstand "a $V_{50}$ ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at 30 degree-angle of obliquity." Armour of America's panels also had to withstand "multiple ballistic impacts of 3 equidistant hits in a 3-inch circle, which is 2.6 inches between shots," and Armour of America's panels were to "stop impacts at 3/4″ from edge and three way butt joint of tile." In contrast, Armour-Works' panels had to withstand "multiple ballistic impacts spaced 6 inches apart or greater[.]" Furthermore, the joint and edge requirement included in Armour of America's contract was relaxed by the Navy in Modification 7 of ArmorWorks' contract.[24] Although Jack Plessinger, a Navy aircraft survivability engineer and defendant's witness, testified that the differences in the multi-hit requirements "may" affect the strength and integrity of the armor, plaintiff provided no definitive evidence to refute defendant's witnesses or to demonstrate that the difference was significant. Plaintiff also provided no cost impact information. It appears from the record, therefore, that the somewhat relaxed multi-hit ballistics requirement in Armour-Works' contract did not result in a substantial change from Armour of America's contract to ArmorWorks' contract.

Besides the ballistics and weight requirements, there are a few other dissimilarities between the two contracts. ArmorWorks' armor had to withstand temperatures between −40 and 165 degrees Fahrenheit, but plaintiff's armor had to withstand temperatures between −67 and 185 degree Fahrenheit. Plaintiff's armor had to meet testing requirements for flammability, but ArmorWorks' did not. Plaintiff's armor had to "maintain structural integrity with altitude change capability of 2,000 feet/minute to 15,000 feet," and withstand centrifuge acceleration levels up to 3Gs, while ArmorWorks' armor only had to withstand the centrifuge accelerations levels up to 3Gs. There also are contract clauses omitted from ArmorWorks' contract that were included in plaintiff's con-

---

**23.** In this regard, the parties have explained that: While all responses to the RFP had to state that the offeror could meet the minimum requirements of the solicitation, in this case a minimum of a 35 percent weight reduction, an offeror could propose a solution that exceeded the minimum set forth in the RFP. An offer to exceed the minimum requirements would constitute an "enhancement" and could be used by the Source Selection Board in making its award decision.

**24.** Although plaintiff points out that Amour of America's panels were larger than ArmorWorks' panels at 12 inches and 4 inches, respectively, panel sizes were not specified in the contracts. In any event, plaintiff did not demonstrate any impact of panel size on reprocurement costs.

tract (for example, Value Engineering, Performance Based Payments and Ballistic Warranty clauses). The plaintiff has failed to demonstrate in the record before the court, and therefore, this court does not conclude, that the change in the temperature requirements or the omission of the aforementioned clauses resulted in material changes between the two contracts. Indeed, plaintiff did not believe the differences were significant enough to merit mention in post-trial briefing.

Additionally, as to reprocurement costs, whether ArmorWorks' contract was modified to include time extensions is irrelevant. The issue is whether changes to the reprocurement contract caused a substantial change and increased cost in the items procured, not the reprocurement schedule. Plaintiff has not demonstrated that the extensions were unreasonable or that there was any cost impact. Moreover, in contrast to plaintiff, ArmorWorks made satisfactory progress during contract performance, whereas plaintiffs performance was documented as unacceptable at a critical time and delivery of the product by plaintiff was endangered, leading to plaintiffs ultimate termination.

Finally, plaintiffs contention that Armour of America's contract provided for the use of KSP–60, whereas ArmorWorks' contract provided for the use of boron carbide, although ultimately hot pressed silicon carbide was used, is incorrect. Neither contract specified the type of material to be used to make the armor, but included performance specifications. Plaintiff proposed KSP–60 and ArmorWorks proposed boron carbide in separate proposals and, in the end, both contractors switched materials to a form of silicon carbide.

Ms. Woehrer, the Navy's contracting officer, noted that ArmorWorks "essentially did all of the same things that the original contract had contemplated." Ms. Woehrer also stated that ArmorWorks' armor "met all the form, fit and function requirements of the originally contemplated armor that we had procured from" plaintiff, which she explained meant that:

> They were able to adhere to the aircraft. They complied with the way that they were able to be applied to the aircraft itself. They performed the same function as the contract had stipulated that they must pass. Form, fit and function.

John Winchester, the Navy's Deputy Program Manager for the airframe, who oversaw the CH–46E helicopter, stated that plaintiff's and ArmorWorks' armor should essentially have been the same because they were based on the same requirements, and the product sought to be procured under plaintiff's contract was the same as the product procured under ArmorWorks' contract. Paul Fitzgerald, the Deputy Assistant Program Manager for the Naval Air Systems Command CH–46E Helicopter Program Office, testified that the original product sought to be procured and the product procured from ArmorWorks were the same because "[t]he RFP for both offerors was the same. And Armor Works exceeded every requirement in the contract that we signed with them."

Defendant's witness, Jack Plessinger, a Navy aircraft survivability engineer, who testified that his job was to identify aircraft vulnerabilities and to determine how to keep an injured aircraft in flight, stated at trial that the item sought to be procured from plaintiff was the same as the item procured from ArmorWorks because "the proposals were for the same piece of armor[,]" and "[t]hey were both lightweight composite armor systems." However, he acknowledged that the weight reduction requirements in the two contracts were not the same. Mr. Plessinger stated that the difference in the multi-hit requirements of Armour of America's and ArmorWorks' contracts possibly could affect the integrity and strength of the armor. He also testified that the joints of the armor are the weakest part, regardless of whether shots are 6 inches (ArmorWorks) or 2.6 inches (Armour of America) apart. Although both plaintiff's and ArmorWorks' contracts differed from the RFPs, based on their individual proposed enhancements, and several of the government witnesses acknowledged some differences in the specifications in plaintiff's and ArmorWorks' contracts, based on the evidence in the record before the court, the court finds that the specifications in ArmorWorks' contract were not so

dissimilar to the specifications in Armour of America's contract as to constitute substantial and material changes. The Navy sought a Light Weight Armor Replacement System, for the CH–46E helicopter, first from Armor and then from ArmorWorks.

Key to the court's findings is the failure of plaintiff, Armour of America, to develop on the record during trial or in the trial exhibits presented to the court, a clear picture of lack of similarity and material differences to counter defendant's evidence presented during the trial. Indeed, at trial, plaintiff only sought to call two witnesses, only one of whom was able to testify, Armour of America's General Manager, John Nehmens.[25] Mr. Nehmens did not testify as to any differences between Armour of America's contract and ArmorWorks' contract. In his deposition, which was accepted as part of the trial record, Armour of America's President, Arthur Schreiber, stated that he had not reviewed ArmorWorks' contract and had no documents concerning ArmorWorks. In addition, the documentary evidence in the record to support plaintiff's assertions is weak.[26]

Turning to the second prong of the test for reprocurement costs, the court considers whether defendant proved that it "actually incurred excess costs[.]" *Cascade Pac. Int'l v. United States*, 773 F.2d at 293–94. To that end, defendant must "show what it spent in reprocurement." *Id.* at 294 (citing *Fairfield Scientific Corp. v. United States*, 611 F.2d at 863–66). As discussed below, defendant has provided sufficient evidence in the record to demonstrate the total cost of the reprocurement performed by ArmorWorks.

According to defendant's contract with ArmorWorks, the potential value of the reprocurement was $8,978,672.00, which included the cost of all optional CLINs. However, not all of the CLINs were exercised and, therefore, the actual amount spent on the reprocurement was $5,899,124.00.[27] The potential value of defendant's original contract with Armour of America was $6,038,958.00, including all optional CLINs. However, the cost of the original procurement with plaintiff would have been $4,391,686.00, had the same options been exercised as were exercised under ArmorWorks' contract. Based on the prices listed in both contracts for the CLINs that were exercised, the excess reprocurement costs amount to $1,507,438.00. This is the same figure sought by defendant in its counterclaim. Defendant also seeks $45,630.00 in administrative costs.

Plaintiff's arguments in rebuttal are without merit. Plaintiff's arguments do not address the issue of whether defendant mitigated excess reprocurement costs, i.e., the costs incurred after Armour of America defaulted. Rather, plaintiff attempts to argue that the government wrongly defaulted Armour of America and, therefore, should have avoided the excess reprocurement costs altogether. Plaintiff also contends that it did not calculate costs in the same manner as ArmorWorks and that there is no proof that ArmorWorks was paid. Plaintiff, however, offers no evidence or explanations for its assertions or evidence to demonstrate the costs paid to ArmorWorks were unjustified or excessive. Actually, the record contains the sworn testimony of the Navy contracting officer, Ms. Woehrer, that ArmorWorks was "actually paid." Ms. Woehrer's testimony also was in conjunction with a discussion, at trial, of

**25.** As noted above, Armour of America's President Schreiber passed away before giving testimony at trial and his testimony given as deposition testimony was entered into the record.

**26.** Furthermore, when asked about the allegations that "the reprocurement contract and the government's actions and several modifications concerning their reprocurement contract" demonstrated bad faith, Amour of America's President, Mr. Schreiber, stated that he "had no idea that it [the allegation] was put in there [to the complaint]. I don't know why it was put in there."

**27.** CLIN 0004 (Travel in Support of CLINs 0001 and 0002) and CLIN 0010 (Travel in Support of CLIN 0009) were both for not to exceed amounts of $50,000.00, for both the Armour of America contract and the ArmorWorks contract. For purposes of simplification, since the CLINs were for the same amounts in the two contracts, and would not, therefore, change excess reprocurement costs, these figures have not been included in the actual amounts paid by the Navy to ArmorWorks on reprocurement contract completion, or included in the amounts that would have been paid by the Navy to Armour of America, had plaintiff completed its contract.

Joint Trial Exhibit 131, "Reprocurement Costs: Spreadsheet" (Jan. 2008), which, again, reflected "actuals paid" in dollars to ArmorWorks. That ArmorWorks completed the reprocurement contract and that Armor-Works was paid for its completed work was essentially uncontested, despite plaintiff's unsubstantiated assertions.

Furthermore, plaintiff's assertion that the reprocurement costs were unreasonable because ArmorWorks' contract included delay costs is incorrect. ArmorWorks' contract price was fixed before delays were incurred, and ArmorWorks accelerated its delivery schedule by ten months at no additional cost to compensate for its four month delay. In sum, plaintiff's argument that defendant did not incur reasonable reprocurement costs is without merit.

The third prong of the test for reprocurement costs requires the court to determine whether defendant has proven that it "acted reasonably to minimize the excess costs resulting from the default," namely defendant must "act within a reasonable time of the default, use the most efficient method of reprocurement, obtain a reasonable price, and mitigate its loses." *Cascade Pac. Int'l v. United States*, 773 F.2d at 294 (citing 41 C.F.R. § 1–8.602–6(a); *Astro–Space Labs., Inc. v. United States*, 200 Ct.Cl. 282, 470 F.2d at 1018; *Envtl. Tectonics Corp.*, 78–1 BCA ¶ 12,986, at 63,308–10 (1978); and *Solar Labs., Inc.*, 76–2 BCA ¶ 12,115, at 58,195–96).

 Defendant awarded the reprocurement contract seventy-one days after Armour of America's termination for default, a reasonable amount of time from the default date on a technically driven procurement. In addition, defendant used a reasonable method to reprocure the armor by reconsidering updated offers submitted by the other vendors who had submitted proposals at the time that plaintiff Armour of America submitted its proposal. After plaintiff was terminated for default, the contracting officer asked each vendor who had earlier submitted a proposal if it wanted to be considered for the reprocurement contract. All vendors responded in the affirmative, and the agency reviewed their updated proposals. Other than the differences in performance period,

the requirements in the RFP remained the same throughout the procurement and reprocurement process. Although no explanation was given as to why ArmorWorks was chosen, the record reflects that ArmorWorks had an Outstanding Technical rating, Low proposal Risk and Low Past Performance Risk, and Contracting Officer Woehrer testified that ArmorWorks was "second in line after Armour of America in the first source selection." In any event, plaintiff does not contest the choice of ArmorWorks, and has not offered any evidence that ArmorWorks was improperly chosen.

Defendant did grant ArmorWorks a four-month extension as to certain deadlines, in return, however, ArmorWorks provided other deliverables ten months ahead of schedule and absorbed "all labor and material costs associated with ... [certain] Government-desired changes[.]" Plaintiffs arguments that defendant failed to mitigate costs because it (1) did not "accept [Armour of America]'s progress," (2) did not understand Armour of America's testing results; and (3) accelerated Armour of America's performance were addressed above and plaintiff's arguments are without merit. Moreover, although defendant did not request that ArmorWorks use a less expensive material, the switch by ArmorWorks from boron carbide to hot-pressed silicon carbide, because boron carbide became unavailable, resulted in a reduction to ArmorWorks' contract price, reducing the reprocurement costs and mitigating the damages.

As to the final factor, whether the price which defendant obtained from ArmorWorks was reasonable, in evaluating potential awardees for the reprocurement, the Navy carefully reconsidered the bids originally offered during the procurement, other than plaintiff's, including its initial evaluations of those bids. The Navy spent 507 hours conducting the reprocurement process, from evaluating proposals to debriefing unsuccessful offerors. In choosing ArmorWorks, the record before the court demonstrates that the Navy conducted a reprocurement process involving adequate competition and consideration of price, technical analysis, and past performance.

Plaintiff, Armour of America, contends that the reprocurement costs sought by defendant are unreasonable because the costs include the use of boron carbide, rather than the lower priced hot pressed silicon carbide. ArmorWorks used boron carbide to produce CLINs 0001–0002 before the material became unavailable. Thereafter, ArmorWorks successfully completed its contract with hot pressed silicon carbide, which was 58% of the price of boron carbide.[28] Plaintiff presented no evidence indicating what the difference in cost would have been to produce CLINs 0001–0002 with hot pressed silicon carbide, rather than boron carbide, and the court is unable to make such a calculation on its own based on the limited record in this regard. As defendant presented sufficient and credible evidence indicating the total cost of reprocurement, plaintiff had the burden of demonstrating that the cost which defendant submitted was excessive or erroneous. *See Seaboard Lumber Co. v. United States*, 308 F.3d at 1300–01 ("Thus, in this circuit, where a contractor's breach results in the necessity for reprocurement of substantially similar goods or services, the burden of proving the effects of changes in the reprocurement contract terms on the contract price is properly placed on the breaching contractor."). Plaintiff has not met its burden. Plaintiff has not shown what reduction in reprocurement costs might have been achievable, or why the actual reprocurement cost was unreasonable.

Plaintiff also urges that the reprocurement costs be reduced because of delays in ArmorWorks' production of the armor. However, plaintiff has not demonstrated what excess costs the Navy may have incurred due to the delays or how they should be reduced from the claimed amount of reprocurement costs. ArmorWorks' contract price was fixed before any delays were incurred. Additionally, while ArmorWorks delayed its contract by four months for the delivery of QTAs, it also accelerated its delivery schedule by ten months, at no additional cost, for the option items.

In sum, the armor procured from Armor-Works was substantially similar to the armor specified in Armour of America's contract and was procured at a reasonable price. The differences in the contracts between plaintiff and ArmorWorks were occasioned by the inability of KSP–60 and sintered silicon carbide to meet contract specifications, the necessity to conduct the reprocurement expeditiously and the fact that it was known that boron carbide could accomplish the job, even though when boron carbide became scarce, the task was accomplished with hot pressed silicon carbide, a cheaper armor material. Based on the record before the court and the limited evidence presented by the plaintiff, the government has demonstrated that it incurred the excess reprocurement costs and acted reasonably to minimize those costs. As such, the factual determinations required of defendant for the imposition of excess reprocurement costs are met, and excess reprocurement costs are awarded to defendant in the amount of $1,507,438.00.

*Administrative Costs*

■ Defendant's counterclaim sought reprocurement costs, including $45,630.00 in "administrative costs." The Default clause in plaintiff's contract, FAR 52.249–8(h), Default (Fixed–Price Supply and Service) (Apr. 1984), provides as follows: "The rights and remedies of the Government in this [Default] clause are in addition to any other rights and remedies provided by law or under this contract. Administrative costs incurred by the government pursuant to a default termination are permitted under FAR 52.249–8(h). *See Southeastern Airways Corp. v. United States*, 230 Ct.Cl. 47, 65–66, 673 F.2d 368, 379–80 (1982) (permitting award of administrative costs in a default termination); *Lassiter v. United States*, 60 Fed.Cl. at 271 (approving administrative costs as part of a reprocurement); *Mega Constr. Co. v. United States*, 29 Fed.Cl. at 501 ("Courts will award damages that are reasonably foreseeable results of the contractor's default in addition to those damages typically contemplated, such as administrative costs incurred by defendant in completing the contract."); *Tester Corp. v.*

---

**28.** According to the record, aluminum oxide (Armour of America's KSP–60), was priced at $10.75/lb.; sintered silicon carbide was priced at $66.00/lb.; hot pressed silicon carbide was priced at $151.00/lb.; and hot pressed boron carbide was priced at $260.00/lb.

*United States,* 1 Cl.Ct. 370, 376 (1982) ("[T]he government has the right to seek common law damages for breach of contract following a termination for default[,]" including administrative costs, if those costs are the "foreseeable, direct, natural and proximate results of the breach." (citing *William Cramp & Sons v. United States,* 50 Ct.Cl. 179, 191 (1915)), *judgment entered,* 1 Cl.Ct. 368 (1983) (other citations omitted)); *see also* John Cibinic, Jr., Ralph C. Nash, Jr., & James F. Nagle, *Administration of Government Contracts* 1022 (4th ed. 2006) (noting that the United States Court of Federal Claims permitted collection of administrative costs incurred by the government in connection with a reprocurement).

Furthermore, FAR 49.402–7(b) (2003) provides: "If the Government has suffered any other ascertainable damages, including administrative costs, as a result of the contractor's default, the contracting officer must, on the basis of legal advice, take appropriate action as prescribed in subpart 32.6 to assert the Government's demand for the damages." In this regard, the government took action to assert its administrative cost claim. Contracting Officer Woehrer's August 26, 2004 Notice of Termination stated that:

> The Government reserves all rights and remedies provided by law and regulation under this contract, including the right to assess the costs associated with the reprocurement of a Light Weight Armor Replacement System from another source. If the Government incurs re-procurement costs as a result of this termination, a demand letter will be issued to your company to cover such costs.

In an October 26, 2004 letter to Armour of America, Contracting Officer Woehrer referenced her earlier August 26, 2004 Notice of Termination and proposed to settle the contract dispute with payment of $2,099,438.00 [29] from Armour of America, "which includes the delta contract costs to procure 147 LWARS units plus the administrative cost to put the new contract in place." On February 28, 2005, Ms. Woehrer issued a contracting officer's final decision, seeking $2,099,438.00 from Armour of America, which included both reprocurement costs for LWARS kits, plus administrative costs incurred by the Navy to award the reprocurement contract. As noted above, defendant's counterclaim in the present action sought reprocurement costs, including $45,630.00 in administrative costs. The court finds that administrative costs incurred in a reprocurement are recoverable, and that defendant properly asserted the administrative costs in the present case.

Plaintiff nevertheless argues that defendant did not "delineat[e] [ ] or defin[e]" the administrative costs claimed and that, therefore, such costs should not be allowed. To the contrary, the administrative costs were defined in detail. Defendant points to the testimony of the contracting officer, Ms. Woehrer, who explained how she calculated the administrative costs based on the work of engineers in reviewing information, preparing reports, and debriefing unsuccessful offerors. The record supports Ms. Woehrer's trial testimony. The record reveals that, in support of the reprocurement costs, four engineers were paid $90.00 an hour for 507 hours of work, or $45,630.00, for reviewing proposals, preparing discussion questions, reviewing and evaluating discussion responses, preparing reports and briefs, participating in the Source Selection Evaluation Board, debriefing unsuccessful offerors, and incorporating ArmorWorks' proposal enhancements into the reprocurement contract. Plaintiff did not cross-examine Ms. Woehrer as to her calculations of the administrative costs or offer contrary testimony or exhibits. The court, therefore, finds that the administrative costs which defendant seeks were "foreseeable, direct, natural and proximate" costs resulting from plaintiff's failure to fulfill its contract, *see Tester Corp. v. United States,* 1 Cl.Ct. at 376, and awards $45,630.00 in administrative costs to the government.

## CONCLUSION

For the foregoing reasons, plaintiff's alleged breach of contract, also alleging bad

---

**29.** After discovery and trial, defendant computes its reprocurement costs at $1,553,068.00, consisting of $1,507,438.00 in excess costs for LWARS kits, plus $45,630.00 in administrative costs.

faith and abuse of discretion (Count I) and alleged breach of the government's duty to cooperate and not hinder performance (Count II) have not been demonstrated in the record before the court by plaintiff. Defendant has demonstrated that the termination for default of plaintiff's contract was reasonable and not in bad faith or an abuse of discretion. Plaintiff has provided no basis to convert the termination for default into a termination for the convenience of the government (Count III). Plaintiffs complaint is **DISMISSED,** with prejudice. Based on the record before the court, defendant's counterclaim is **GRANTED** and defendant is awarded reprocurement costs in the amount of $1,507,438.00 and $45,630.00 in administrative costs, for a total sum of $1,553,068.00. Costs to the defendant.

**IT IS SO ORDERED.**